**DURELL et al. v. PUBLIC SERVICE COMPANY OF OKLAHOMA.**

No. 24831.  Nov. 12, 1935.

550

C. H. Jameson and H. M. Gray, for plaintiffs in error.

Hunter L. Johnson, V. E. McInnis, and Theodore Rinehart, for defendant in error.

PHELPS, J. The Public Service Company of Oklahoma constructed a high line from Tulsa to Weleetka. This high line was constructed of three strands of heavy, uninsulated wire, carrying 66,000 volts of electricity. The wire was suspended from crossarms between pairs of poles, 40 feet high, the poles in each pair being about ten feet apart. Each pair of poles, joined by the cross-arms, is called a "frame," and the frames, supporting the wires, were placed along the high line at intervals of 550 feet.

This high line was run across private property, and the right of way therefor was obtained by condemnation proceedings. Among the owners of the private property crossed by said line were John M. Durell and Emma Durell, who complained of the inadequacy of damages arrived at by the appraising commissioners. The appraising commissioners set their damage at $400, and they demanded a jury trial on the issue. About one mile of their land was crossed by the high line. The jury returned a verdict of $700, and the Durells appeal. Their contention in the lower court was that the damage ran into thousands of dollars. In this appeal they contend, among other things, that certain remarks of the trial judge and the admission of incompetent evidence probably caused the jury to greatly underrate their damage. The Public Service Company will be referred to as plaintiff, and the Durells as defendants, as they were called in the lower court.

When the condemnation proceeding was first instituted, the trial court appointed Messrs. Brockman, Avery, and Eaton to appraise the damage to the various tracts of land in accordance with our statutory provisions on that subject. During the instant trial on the limited question of defendants' damage, the plaintiff company had each of the commissioners testify in support of the award of $400 which they, the commissioners, had made. Strictly speaking, the question for consideration was not whether the award was correct in amount, the real issue being the damage sustained by defendants, which was measured by the difference in market value of the land immediately preceding and immediately after the construction of the high line, and attributable to the construction thereof.

However, the defendants do not object to that variance so much as they object to a remark of the trial judge, in the presence of the jury, while Commissioner Brockman was being cross-examined by the defendants' attorney. The attorney had been interrogating the witness concerning the matters considered in estimating the damage, it appearing that the commissioners had visited the farm together. The witness had just testified that not more than $400 damage had been done the particular tract by the erection of the high line, when counsel asked him if that was the amount which Mr. Avery, another commissioner, had told the witness the damage should be. The witness answered that it was Mr. Avery's opinion and also his own opinion. The following proceedings then took place in the presence of the jury:

"Q. Isn't it a fact that Mr. Avery told you and Mr. Eaton what the damage should be? A. No, sir; I don't think he did. The Court: Mr. Brockman has bought and sold more land than Mr. Avery has. You don't know Mr. Brockman like I do or you would know that nobody could tell him what to do. Mr. Jameson: Just a minute. I except to the remarks of the court and now move the court to discharge the jury and declare this case a mistrial on account of the remarks of the court. The Court: Overruled. Mr. Jameson: Exception."

The foregoing was urged strenuously in the trial court as one of the grounds for new trial, which motion was taken under advisement by the trial court. In overruling the motion for new trial the trial judge commented at length concerning this remark and stated that it was justified in fairness and courtesy to the witness, unless defendants' attorney at the time intended to later introduce evidence tending to prove that Avery did in fact influence the witness's estimate of the damage, and that it was further justified because on the voir dire examination of jurors defendants' attorney asked each

juror if he owned any stock in any of the Insull companies, it appearing that one of the Insulls was president of the plaintiff company and that Commissioner Avery had been associated with him in business,—that thus it was apparent from the outset that defendants had sought to increase the amount of their verdict by appealing to the jurors' passion and prejudice against the Insulls, who, the trial judge stated, were in popular disfavor. Yet the judge stated that such questions on the voir dire were proper, and that the question which prompted this unfortunate remark was also proper, with which latter statements we agree.

Certainly it was not only the right but the duty of defendants' attorney to learn whether there were any interested parties on the jury. If a prospective juror owned stock in the plaintiff company, his interest was direct and active. If he owned stock in an affiliated company, he may or may not have been thereby biased, depending on the juror.

It was also permissible, and a proper part of the cross-examination of the witness Brockman, to inquire into the question of whether his estimate was the direct expression of his own mind or the hearsay repetition of another's estimate. The rule as to hearsay testimony was as applicable to him as to any other witness. And even assuming that the figure was his own appraisement, and not hearsay, we may not lose sight of the fact that appraisals of value and damage are largely opinions and conclusions, as distinguished from the basic facts, and that such opinions and conclusions are not events, which "happen," but are the result of formative, progressive reasoning. It is only by a stretching of the rules of evidence in the first place that conclusions are permitted to emanate from the witness s and in some cases, their proper locus being the jury room. Hence every reasonable latitude in such cases should be permitted on cross-examination, to determine the strength or weakness of the premises upon which such conclusions are based. If Mr. Brockman arrived wholly or in part at his own conclusion upon the strength of the previous conclusion of Mr. Avery, it would be a case of one witness basing his conclusion on the conclusion of another,—no more permissible among experts than any other class of witnesses.

When Mr. Brockman testified, the other appraisers had not yet been on the witness stand. It was well within the rights of defendants, at this time, to interrogate as to all matters touching upon whether witness was speaking not only from, but **how much** from, his own knowledge and experience. Independently of whether defendants could later prove that Mr. Brockman's appraisal was influenced by, or founded upon, Mr. Avery's appraisal, they were entitled to all of the opportunities afforded by the rules of procedure to discover latent defects, of a reasonably possible nature, in the testimony of their opponents. Else the right of cross-examination would be of little benefit. We do not mean that counsel should be permitted indulgence in wild, unreasonable questioning, leading to innuendo and suggestion which he figuratively leaves in the air, without evidence of his own to support or justify such questioning. This was not that kind of an instance. In determining the degree in which the witness has relied on the opinions of others, in forming his own conclusion or opinion, counsel on cross-examination may question directly on that assumption in order to reveal whether it is true in fact, and, in so doing, he is not thereby "discourteous" to the witness within the rules of trial procedure.

The only important issue in this trial was the amount of damage sustained. That was the ultimate issue. Before solution of that question was possible the jury had to determine which set of witnesses to believe. The relative credibility of the various witnesses was therefore the heart of the lawsuit, the thing upon which everything depended. In this state the credibility of the witnesses and the weight of their testimony is for the jury's exclusive determination. City of Newkirk v. Dimmers, 17 Okla. 525, 87 P. 603; King Auto Service v. Hodges, 143 Okla. 260, 288 P. 483. One effect of the court's remark, and this cannot be denied, was to inform the jury, with all the solemnity and force inherent in an instruction itself, that the witness's immediately preceding answer was to be taken as true and unimpeachable, that when witness stated he didn't "think" Mr. Avery told him what the damage should be, then Mr. Avery didn't; that witness was to be believed at all events, and that "nobody could tell him what to do." Also, by this remark the court may as well have instructed the jury that Mr. Brockman was more nearly qualified as an expert on this matter than was Mr. Avery.

If the plaintiff company had offered some witness to testify to the fact that its own witness could not be influenced by others, the court would instantly have excluded such

evidence. unless the opposition had first assailed his integrity by the introduction of evidence calculated to establish that he was unworthy of belief. How, then, does its admissibility gain favor because it was uttered by the judge?

Though we are sure the judge had good intentions, and was not moved by partiality or unfairness, that fact does not lessen the injury done defendants. The plain truth is that the trial judge unintentionally became the most important witness in the case, in that he was the only person who testified directly as to the credibility of any witness, and relative credibility was, the determining factor of the trial. Add to this the tremendous importance attached by the jury to every word and gesture of the trial judge, and defendants' plight at being denied the right to cross-examine such evidence, and we have a situation whereunder a substantial right has not only been affected, but positively obliterated, necessitating a new trial in accordance with law.

The defendants next present as error the admission of testimony showing what compensation the plaintiff company. paid other landowners for rights of way. This evidence included figures based on the average amount paid per frame, over distances of from 300 to 500 miles, on this and other rights of way.

The true measure of damage was the difference, caused by the high line and its contemplated use and maintenance, between the market value of the land immediately before and immediately after the placement of the high line. Due to the difficulty to be encountered in finding a safe and accurate means of determining actual market value of real estate, the courts have been somewhat lenient in permitting a wide latitude of evidence in this particular. Evidence showing other sales of similar land in the same community is sometimes permitted, but forced or involuntary sales of land are seldom regarded as affording dependable indications of true market value. Market value means the value when sold on open market. If the sale is forced, the transaction is the very opposite to a voluntary sale on open market.

The rule in nearly every state in the Union, and the overwhelming weight of authority, is that where the question in issue is the market value of land, evidence of condemnation prices of other tracts of land is incompetent for the purpose of proving the market value of the tract in question. Funda-

mentally, this is because those other sales are regarded as being little other than compromises, and the courts proceed on the theory that in many instances the condemnor is willing to pay more than the market value, or the owner is willing to take less than the market value, in order to avoid the trouble, annoyance, and expense of a lawsuit. Thus the rule is closely akin to the rule which forbids evidence of offers of compromise in the same suit.

The following is from Lewis on Eminent Domain (3d Ed.) section 667:

"What the party condemning has paid for other property is incompetent. Such sales are not a fair criterion of value, for the reason that they are in the nature of a compromise. They are affected by an element which does not enter into similar transactions made in the ordinary course of business. The one party may force a sale at such a price as may be fixed by the tribunal appointed by law. In most cases the same party must have the particular property, even if it costs more than its true value. The fear of one party or the other to take the risk of legal proceedings ordinarily results in the one party paying more or the other taking less than is considered to be the fair market value of the property. For these reasons such sales would not seem to be competent evidence of value in any case, whether in a proceeding by the same condemning party or otherwise."

In order for sales of other pieces of land to serve as an indication of the market value of the land in question, it seems very clear that, to have that tendency, those other sales must have been made under circumstances where the vendor was not compelled to sell at all events, but was at liberty to invite competition among those desiring to become purchasers. The New Jersey case of Curley v. Mayor and Aldermen of Jersy City is reported in 43 L. R. A. (N. S.) 985, and the note following that case is a complete and exhaustive brief on this subject. The reasoning in the many cases cited therein appeals to us, and we prefer to follow the weight of authority on this question, because to us it appears to be supported by the weight of reason as well as numbers.

The trial judge recognized the general rule, in his remarks on the occasion of overruling the motion for new trial, but gave it as his opinion that while isolated cases should come within the rule, the average or general unit price of compensation, as gleaned from an averaging of hundreds of cases, should form a dependable index. We are unable to make this distinction. We can lend no great-

er evidentiary importance to the average of a great number of forced sales than we could to one forced sale; regardless of from how many numbers the average was obtained, nevertheless said average would be obtained from a source tainted throughout with the objectionable feature of compromise. At any rate, prices at isolated forced sales, and the average sale price to be arrived at from a combination of a great number of such sales, are so clearly similar in objectionable features as to make it inadvisable for us to create an exception to the general rule, on that basis.

The plaintiff company contends that even though this evidence would ordinarily be inadmissible, it became admissible here, as rebuttal to the evidence introduced by defendants to the effect that farmers consider these high lines dangerous, influencing and aggravating the depreciation in value. We fail to agree with this reasoning. Whether other landowners settled for $10 per frame or $50 per frame has little if any connection with the question of danger, in the absence of evidence as to just how much was apportioned to the item of danger. It is true that if a great many other landowners **voluntarily** accepted small payments, it might circumstantially show little fear of danger, but the fact that those other settlements partook of the nature of compromise makes the evidence just as objectionable on the danger issue as on the value issue. Therefore the contention that said evidence is admissible because it rebuts defendants' contention that the lines are dangerous is subject to the same objection which renders it inadmissible on the issue of value. The taint of compromise forbids the use of such evidence for either purpose.

Though its significance was not seriously debated by the parties, we observe considerable testimony in the record from witnesses who were permitted to state their opinion of the "damage" done to defendants' land by the erection of the high line. In a retrial of this case, this should not be permitted. It is for the witnesses, and evidence from other sources, to develop proof of the market value of the land immediately preceding and immediately following the erection of the high line; the difference in these values is the damage, and that is a question for the jury to determine, and no witness should be permitted to go that far in his conclusions. In other words, the evidence should develop the relative market values, and from that

evidence the jury draws its own conclusion as to the consequent damage.

There are other contentions by the defendants, which are unnecessary to discuss here. For the errors considered above, the judgment is reversed and the cause remanded for a new trial.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BUSBY, and GIBSON, JJ., concur. BAYLESS, WELCH, and CORN, JJ., absent.