**James V. MARCUM, Commissioner of Revenue, et al., and Kentucky Tax Commission, Appellants,**

**v.**

**KENTUCKY & INDIANA TERMINAL RAILROAD COMPANY, Appellee.**

Court of Appeals of Kentucky.

May 1, 1962.

Petition for Rehearing Sustained in Part and Opinion Modified Dec. 14, 1962.

Frank A. Logan, Louisville, William S. Riley, Hal O. Williams, Frankfort, for appellants.

Middleton, Seelbach, Wolford, Willis & Cochran, Louis Seelbach, Louisville, for appellee.

WILLIAMS, Judge.

Kentucky & Indiana Terminal Railroad Company (K & I), a Louisville, Kentucky corporation, is a common carrier engaged in interstate commerce. It owns and operates a bridge across the Ohio River between Louisville and New Albany, Indiana, and a switching terminal which includes about 130 miles of tracks. Many of the major industries in Louisville are located on K & I tracks. The majority of business transacted by K & I is with its stockholders.

K & I was incorporated in 1900. Its entire capital stock consists of $75,000, divided into 750 shares at $100 each. The Southern Railway Company (Southern), the Baltimore & Ohio Railroad Company (B & O), and Chicago, Indianapolis & Louisville Railway Company (Monon), are each owners of one-third of the authorized capital stock. In 1911 the stockholders entered into a contract with K & I whereby it was agreed that the stockholders would pay for the use of K & I property and facilities an amount necessary to meet all expenses and obligations of K & I after taking into account other revenue received by K & I. Each stockholder agreed to pay the cost of switching service performed for it in proportion to the number of cars handled.

In accordance with that contract, monthly payments by the stockholders are determined as follows: Transportation and maintenance of equipment expenses are added together. Of the total the stockholders pay an amount determined by the ratio which the cars handled for the stockholders bears to the total cars handled by K & I. To the amount which remains is added all other expenses suffered by K & I. From that total is deducted the income realized by K & I from nonstockholders. The resulting figure is the deficit for that period. That deficit is prorated among the stockholders according to the services rendered to each. Thus each stockholder pays to K & I its proportionate share of the transportation and maintenance of equipment expenses plus its share of the deficit experienced during the month. There results no appreciable net income to be reported by K & I.

Various other railroads, which are nonstockholders, pay for switching services a rate provided for by a tariff filed with the Interstate Commerce Commission.

The Department of Revenue is empowered by statute (KRS 141.205(1)) to require a parent corporation and a subsidiary corporation doing business in this State to file a consolidated return if it appears that intercorporate transactions tend to reduce the net income of either or both below the amount which would probably result if the two were not related. And KRS 141.205(5) reads as follows:

"In the case of a corporation doing business in this state and not permitted or required to file a consolidated return under subsection (1) of this section that carries on transactions with stockholders, directly or indirectly, the de-

partment shall adjust the net income of such corporation to an amount that would result if such transactions were carried on at arm's length."

The department, acting under authority of KRS 141.205(5), adjusted K & I income tax liability for the years 1952 through 1955. For the purpose of simplification, we shall consider only the year 1955. The department ruled that there was a tax deficiency for that year in the amount of $158,488.12. A formal hearing before the Kentucky Tax Commission was had and it was ordered that the tax as found by the department was owed by K & I. Appeal was taken to the Franklin Circuit Court. From the judgment of that court, setting aside the order of Kentucky Tax Commission on the ground the switching charge allocated to the stockholders was arbitrary, this appeal is taken.

The department limited its computation of net income to that service defined in Item 270 of ICC Tariff No. 36, as follows:

"Switching Charges. Between connections with the K & IT and industries and tracks located on the K & IT in connection with shipments handled in road haul movements to or from Louisville, Ky. (except express cars), the switching charge of the K & IT will be $20.30 per car."

No income which should have been realized by K & I for other switching services performed for the stockholders was included.

The above tariff provides that a charge of $20.30 per car will be made for switching services between connections with K & I and industries and tracks located on K & I. Nonstockholders paid $20.30 per car for the defined services. Stockholders accounted only for services performed in the movement of cars between connections with K & I and industries. The movement of cars for stockholders between connections with K & I and tracks located on K & I was not figured at the rate set out in the above tariff, but was calculated in a different manner according to the cost involved. It is argued that the contract between the stockholders and K & I permits that accounting to be done, which is true. That does not abrogate the fact, however, that a car of a nonstockholder handled in the same manner would require the charge of $20.30.

The only movement at issue here involves loaded interstate cars switched between connections with K & I and industries and tracks located on K & I in connection with shipments handled in road haul movements to or from Louisville, Kentucky, in which the road haul carrier wholly or partially absorbed the switching charge. The department determined the applicable number of cars so handled for stockholders for the year 1955 and applied the rate set out in the tariff in determining the tax deficiency for that year.

■ The statute (KRS 141.205(5)) directs the department to adjust the net income to an amount that would result if transactions between a corporation and its stockholders were carried on at arm's length. An arm's length transaction is one which compares favorably with the usual course of action taken in the conduct of business with the trade generally. Bourjois, Inc. v. McGowan, D.C., 12 F.Supp. 787, involved an excise tax on toilet preparations. The taxpayer did not offer merchandise for sale to the wholesale trade generally at the prices it charged its sales corporation. It was said that sales between a manufacturing company and sales corporations in which the manufacturing company owns all of the stock are not ipso facto "not at arm's length," but whether such sales are at arm's length raises a question of fact, and the presumption is that they are not. And, in Inecto, Inc. v. Higgins, D.C., 21 F. Supp. 418, it was held that sales by a corporation to a controlling company at a price much less than the price to the trade generally were not arm's length transactions.

■ Here the payments made by the stockholders assured K & I that it would not operate at a loss. But, under the con-

tract, and by the accounting method employed, it was equally assured that K & I would not operate at a profit. Such transactions were not carried on with nonstockholder railroads, and, in view of KRS 141.-205(5), were not carried on at arm's length between K & I and its stockholders.

It is further argued that the department does not have the power to create income or impose a tax upon nonexistent income. To substantiate this argument several cases are cited which interpret Section 45 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 45. That section gives the Commissioner of Internal Revenue the authority to distribute, apportion or allocate gross income. Those cases are authority for the proposition that an allocation may not be made of a fictitious income, and that income must exist before an allocation can be made. We do not have the same problem here. The statute in question (KRS 141.205(5)) mandatorily directs the department to adjust the net income to an amount that would result if transactions were carried on at arm's length. According to Webster's New International Dictionary, "to adjust" is *"to settle or arrange," "to free from differences or discrepancies," "to make exact," "to put in order."* The statute does not anticipate creation of income where none in fact should exist. It does direct the determination of the amount of income a corporation would receive if it charged both owners and nonowners the same rate for the same service rendered. Simply stated, the statute means that the department shall determine the net income of a subject corporation to be an amount equal to that which it would have received had all of its business been carried on with strangers.

To imply that K & I could have no net income is tantamount to closing one's eyes to reality. The proof shows that the payment made for service by the stockholders was less than the actual cost of such service. Had stockholders paid in the same proportion as nonstockholders this would not have been true. There would have been net income.

It is contended that the initial determination of the application of tariff rates is for the Interstate Commerce Commission and not for the court. The fallacy of that argument is that neither the department nor the court is attempting to dictate a rate which must be collected by K & I from its stockholders. The tariff is utilized only in setting a standard by which the net income (for income tax purposes) is calculated. It matters not whether the established rates are actually paid to K & I by the stockholders. They may enter into any contract which pleases them without offending KRS 141.205(5). But when the time comes to pay the state income tax the statute says it shall be determined by calculating the amount that would have resulted had the transactions been carried on at arm's length. The tariff is merely a guide by which that calculation is made.

It is argued that the department did not set up a standard; did not show what K & I could get for switching services through an arm's length transaction. The obvious answer is that K & I was receiving $20.30 for the switching services defined in the above quoted tariff from those railroads which were nonstockholders. The collection of an established rate for a specified service from one railroad does surely serve as precedent for the rate which could be collected from another. To the extent that this charge for a similar switching service was allocated to the stockholders, the Commission's order cannot be deemed arbitrary.

It is finally contended that the $20.30 tariff applies to only 34,041 switching movements, and that 322,891 switching movements fall within some other classification for which no tariff charge was shown or collected. K & I did not undertake to prove what a reasonable charge for these particular switching services would be.

In our opinion the Department made a prima facie showing that the $20.30 rate may be allocable to the stockholders as a proper charge for all switching operations

in connection with road haul movements. However, because of the manner in which the issues were developed in this case, because of the peculiar nature of this business, and because of the necessity for complete fairness in the assessment of this tax, we are of the opinion that the parties should be given further opportunity to produce evidence of what would have been the reasonable charge for those switching movements which it is claimed are in a different category from those to which the $20.30 tariff rate applies.

The judgment is reversed, with directions to confirm the Commission's order in part, and to remand the case for further proof and consideration consistent with this opinion.

STEWART, C. J., and MONTGOMERY and BIRD, JJ., dissenting.