Application of CONTINENTAL OIL COMPANY for an Order Amending Corporation Commission Order No. 38493 Establishing Drilling and Spacing Units for the Third Bromide Common Source of Supply— Southwest Sandy Creek Pool, Murray County, Oklahoma.

CONTINENTAL OIL COMPANY, Plaintiff in Error,

v.

The CORPORATION COMMISSION of the State of Oklahoma, Defendant in Error.

No. 39139.

Supreme Court of Oklahoma.

May 29, 1962.

As Corrected Oct. 22, 1962.

Rehearing Denied Oct. 23, 1962.

John W. Wolfe, Richard R. Linn, Mainard Kennerly, John Wimbish, Oklahoma City, for plaintiff in error, Continental Oil Co.

Robinson, Shipp, Robertson & Barnes, by T. Murray Robinson, J. Stanley Gill, Oklahoma City, for Van-Grisso Oil Co.

Ferrill H. Rogers, Conservation Atty., Oklahoma City, for defendant in error, Corporation Commission.

IRWIN, Justice.

On December 28, 1958, the Commission made and entered Order No. 38493, which established 20 acre drilling and spacing units for the devolopment of the Third Bromide common source of supply underlying certain lands in Murray County. Three wells had been completed before the order was entered. (1) Van-Grisso-Billesbach No. 1, located in the center of the SE¼ NE¼ SW¼ of Sec. 34, and designated as the permitted well for the drilling and spacing unit for the E½ NE¼ SW¼ of Sec. 34; (2) Continental-Greer No. 1, located in the center of the SW¼ SE¼ of Sec. 34, and designated as the permitted well for the drilling and spacing unit for the E½ SW¼ SE¼ of Sec. 34; and (3) Continental-Greer No. 2, located in the center of the SE¼ SW¼ of Sec. 34, and designated as the permitted well for the E½ SE¼ SW¼ of Sec. 34. It is to be noted these three wells form a triangular pattern.

Thereafter, Continental filed its application to reassign the Continental Greer Well No. 2, as the permitted well for the W½ SE¼ SW¼ instead of the permitted well for the E½ SE¼ SW¼ as prescribed by Order No. 38493. If such application were granted, it would permit Continental to drill a well in the NE¼ SE¼ SW¼, which would be the permitted well for the E½ SE¼ SW¼. The grounds for the application for an order amending Order No. 39493 are that such amended order would prevent waste and secure the greatest ultimate recovery of oil and gas and would protect the correlative rights of all owners of economic interests.

The application for an order amending Spacing Order No. 38493, was referred to a trial examiner for the purpose of taking testimony and reporting to the Commission. After hearing all the evidence, the trial examiner took the matter under advisement and thereafter filed his report with the Commission recommending that the application be granted.

Van-Grisso Oil Company filed its exceptions to the report of the trial examiner and the exceptions were argued to the Commission. The Commission, inter alia, found:

"4. That no sufficient change in the information available as to the structure has been developed since said Order No. 38493 was entered to justify amending said order.

"5. That taking into consideration all of the evidence, facts and circumstances in this cause, and in the interest of securing the greatest ultimate recovery of oil from the pool, the prevention of waste and the protection of

correlative rights, this application should be denied."

Continental Oil Company perfected its appeal from the Commission's order denying its application for an order amending spacing Order No. 38493.

## CONTENTIONS

Van-Grisso does not question the authority of the Commission to modify the prior unappealed Order No. 38493, but contends that Continental has failed to produce credible and substantial evidence showing a substantial change of condition in the area sufficient to authorize and require the Commission to modify or change the original order.

Continental contends that it is the duty of the Commission to amend a prior spacing order so as to prevent underground waste and so as to protect correlative rights from confiscation where the uncontroverted evidence of properly qualified sworn witnesses shows that the information gained in the drilling of wells subsequent to the entry of such order demonstrates changes in the geological conditions thought to exist when the spacing order was entered; that underground waste and the destruction of correlative rights can be prevented without interfering in any respect with the legitimate interests of any person if the application were approved.

## FACTS

The report of the trial examiner, who recommended the application be granted, contained, inter alia, the following findings:

" * * * that subsequent to Order No. 38493, the following wells have been drilled: Continental Oil Company's No. 1 Dalley, located in the SW/4 of the NE/4 of the SW/4 of Section 34, Continental Oil Company's No. 3 Greer, located in the SW/4 of the NW/4 of the SE/4 of Section 34, Continental Oil Company's No. 4 Greer, located in the SW/4 of the SW/4 of the SE/4 of Section 34, the Pan American Petroleum Corporation's No. 1 West, located in the NE/4 of the NE/4 of the NW/4 of Section 3, Township 1 South, Range 2 East; that it is the testimony in this cause that by the drilling of these additional wells, additional geological information has been obtained which indicates a change in the knowledge of the conditions as compared to that thought to exist at the time Order No. 39493 was entered; that with the drilling of the additional wells, additional control has been gained and the top of the structure now appears to be located within the E/2 of the SE/4 of the SW/4 of Section 34; that all wells in this area have a common water table and are producing from the Third Bromide Sand common source of supply except for the two dry holes which are Continental's No. 1 Dalley, located in the SW/4 of the NE/4 of the SW/4, and Continental's No. 3 Greer, located in the SW/4 of the NW/4 of the SE/4 of Section 34; that said No. 1 Dalley Well was structurally in position to produce, however the top part of the sand section was not developed and was not porous; that said Continental's No. 3 Greer was structurally low and near the water table and had shaly conditions in the sand; that the productive area lying west of the SE/4 of the SW/4 of Section 34 has been sharply limited by the oil-water contact line; that the limits of the reservoir to the North have been established by the failure of the sand to develop and the existence of two faults.

"5. That it is the testimony in this cause that if Continental Oil Company is permitted to assign the well located in the approximate center of the SE/4 of the SW/4 as the permitted well for the unit consisting of the W/2 of the SE/4 of the SW/4 rather than the E/2 of the SE/4 of the SW/4 and then is permitted to drill a well within the permitted location, which would be within the approximate center of the Northeast 10 acres of the 40-acre tract de-

scribed as the SE/4 of the SW/4 of Section 34, then said well would encounter approximately 80 feet-plus of productive sand; that it is the testimony in this cause that if the applicant is not permitted to drill a well within the approximate center of the NE/4 of the SE/4 of the SW/4 of Section 34, an amount of recoverable oil underlying the E/2 of the SE/4 of the SW/4 would not be recovered by the existing wells drilled and completed in the Third Bromide Sand, as the high part of the Third Bromide Sand structure appears to be in the E/2 of the SE/4 of the SW/4 of Section 34.

"6. That there is a conflict in testimony as to the exact location of Continental's No. 2 Greer Well, but the evidence indicates that said well is in the approximate center of the SE/4 of the SW/4 of Section 34.

"7. That due to the change in the knowledge of conditions and in the interest of securing the greatest ultimate recovery of oil from the pool, the prevention of waste and the protection of correlative rights, this application should be granted.

"8. So, taking into consideration all of the evidence, facts and circumstances in this cause, this application should be granted and an order should be made permitting and authorizing Continental Oil Company to assign its Greer No. 2 Well, located in the center of the SE/4 of the SW/4 of Section 34, as the well for the unit described as the W/2 of the SE/4 of the SW/4 of Section 34, and that it should be permitted and authorized to drill a well at the permitted location on the unit described as the E/2 of the SE/4 of the SW/4 of Section 34, and that Order No. 38493 should be amended to so show."

The above findings were based upon the testimony submitted in behalf of Continental. Neither Van-Grisso nor the Commission submitted evidence. Robert W. Allen, assistant Division Geologist for Continental, who testified at the original hearing, qualified as an expert and his testimony was to the effect that: at the time of the original hearing, the best information available at that time indicated the highest portion of the reservoir was to the north; since the original hearing, two direct offsets to Van-Grisso's Billesbach No. 1 have been drilled, Continental Dalley No. 1, to the West and Continental Greer No. 3, to the East; that both of these holes were dry. That Dalley No. 1 is structurally in position to produce, but the top of the sand is not developed and the sand is not porous; that Greer No. 3 is structurally low; there are two faults extending east and west to the immediate north of Billesbach No. 1 as disclosed by the drilling of Dalley No. 1 and Greer No. 3; dipmeter tests on Greer No. 1 showed a slight dip to the southeast; dipmeter tests on Greer No. 2 showed a dip to the west; the Greer Fault which lies to the south and east of all the wells drilled is shown on the structure map used at the first hearing; Billesbach No. 1 has 40 feet of net effective pay; Greer No. 1 has 64 feet of net effective pay and Greer No. 2, 44 feet of net effective pay. From this information, Allen concluded that the productive area under Billesbach No. 1 is limited to 6½ acres; that the producing zone is limited to the southeast by the Greer Fault; to the North by the two faults extending east and west and to the northeast and southwest by oil-water contact; and that a well drilled in the center of the SW of the SE of the SW would have from twenty to twenty-five feet of productive sand.

Allen further testified that from the information gained from all seven of the wells, he prepared the structure-isopach map introduced in evidence; that the map was drawn in accordance with good geological practices on the basis of all available information; that the highest portion of the reservoir is in the E½ of the SE of the SW of Sec. 34, instead of to the north as originally interpreted; that by his interpretation and by projection, a new contour, showing 80 feet of effective pay sand cover-

ing most of the E½ of the SE of the SW is now shown; that there will be 80 feet of productive sand within the new contour; that such sand will be topped 30 feet higher than in the other wells; that in his opinion a well drilled in the NE¼ of the SE¼ of the SW¼ would in no way affect Billesbach No. 1; that such well would recover oil not recoverable in any well then drilled because the top of the effective producing sand would be thirty feet higher than in the other wells.

Donald B. Pray, Production Engineer for Continental, qualified as an expert, testified that he heard the testimony of Allen and agreed with Allen's conclusions; that figuring Billesbach No. 1 and 6½ acres of effective production under it, such well would have 86,750 barrels of recoverable oil and by using ten acres of effective production, there would be 133,500 barrels of recoverable oil; That without further development within the perimeter of the three wells, Billesbach No. 1 would recover 201,500 barrels of oil; That if the exception is granted and the offset well is drilled, Billesbach No. 1 would recover 164,000 barrels of oil; that if the exception is not granted there would be 55,000 barrels of recoverable oil left in the reservoir.

Pray also testified the dipmeter test on Greer No. 2 shows a dip to the west and the map was contoured on the best evidence available; that a well drilled in the SW SE SW would be 15 feet lower structurally than Billesbach No. 1 and would not recover as much oil and would not protect the correlative rights of the owners in the NE SE SW but that it would make a commercial producer; that Continental owns 60 acres of the estimated 80 acres underlain with the Third Bromide productive sand.

## CONCLUSIONS :

It must be borne in mind that this is not a proceeding wherein Continental Oil Company seeks an original order establishing well spacing and drilling units, but, rather is one wherein Continental seeks to modify a previous order which was made upon application of, and evidence submitted by the Continental Oil Company.

Title 52 O.S.1961 § 87.1(a) empowers the Commission to establish well spacing and drilling units to prevent or to assist in preventing waste or to protect or assist in protecting the correlative rights of interested parties.

The Legislature intended and contemplated that orders establishing well spacing and drilling units could and should be modified when it is shown that modification is necessary in order to conserve oil or gas or bring about a fair and equitable production of the oil or gas. See Application of Bennett (Vierson v. Bennett) (Okl.), 353 P.2d 114.

The Commission has a wide discretion in the performance of its statutory duties and this court may not substitute its judgment on disputed questions of fact for that of the Commission, unless the findings of the Commission are not supported by the law and substantial evidence. See Shell Oil Company v. Davidor & Davidor, (Okl.), 315 P.2d 259.

When an application is made to vacate, amend or modify a spacing and well drilling unit established by a former order of the Commission, which has become final, the Commission is without authority to entertain or grant such application in the absence of a showing of a substantial change of condition in the area since the former order was made or other change of factual situations specified in the statute. See Wood Oil Company v. Corporation Commission, 205 Okl. 534, 239 P.2d 1021.

In the instant proceeding before the Commission, the burden was upon Continental, which filed the application to amend the original order, to show a substantial change in the knowledge of the conditions existing in the area since the former order was made or other change of factual situations specified in the statute.

We will now review the evidence to determine if the order denying the application to amend should be sustained under the

rules above set forth. As heretofore stated, the only evidence with reference to additional geological information and change of knowledge of the conditions existing was that of Continental. Although it was admitted that the opinions expressed in behalf of Continental were "projected interpretations". There is no evidence refuting or contradicting these "projected interpretations".

When we examine the evidence, we find at the time the original order was entered only three wells had been drilled. These wells formed a triangle with the Billesbach No. 1 well to the north, which had 40 feet of sand; Greer No. 1 to the southeast, which had 64 feet of sand; and Greer No. 2 to the southwest, which had 44 feet of sand. There was a known fault to the south and east of these wells. From this information, it was believed that the pool extended to the north and east and the highest point in the pool was to the northeast when the original order was entered. The original order was responsive to the then available information.

Subsequent to the order, a well offsetting the Billesbach No. 1 to the west and a well offsetting it to the east were drilled. Both were dry. The east offset encountered salt water and the west offset showed the sand to be undeveloped and not porous. Two faults were encountered which were shown to extend east and west and to the immediate north of the Billesbach No. 1.

Dipmeter tests showed a dip to the south and east from Greer No. 1 and a dip to the west from Greer No. 2.

In the opinion of the geologist and the engineer, the pool did not extend to the north as originally believed but was cut off by the faults and water contact, and the top of the structure has now been established as being in the SE¼ SW¼ of the section. The geologist was of the opinion that the Billesbach unit had only 6½ acres of productive oil underlying said unit instead of 20 acres, as was believed when the original order was entered.

The opinion evidence with reference to the prevention of waste and the correlative rights of the parties disclose that the Billesbach unit has 6½ acres of productive sand and is underlain with 86,750 barrels of recoverable oil; that if the unit has 10 acres of productive sand there would be 133,500 barrels of recoverable oil; that unless the application is granted, the well will recover 201,500 barrels of oil and there will be 55,000 barrels of recoverable oil left in the ground; that the Billesbach No. 1 will recover 164,000 barrels of oil if the application is granted. From the evidence submitted we can not conclude that these figures are not substantially correct.

In analyzing the evidence we find that the information obtained from drilling the additional wells subsequent to the entry of the original order, discloses that the geological structure of the pool is not as it was interpreted to be when the original order was made. There is substantial evidence from the additional information obtained that the common source of supply has been limited to the northwest by the dry hole drilled on the location west of the Billesbach unit and to the northeast by the dry hole drilled on the location east of the Billesbach unit, and on the west by the established oil—water contact line. There is also substantial evidence that the Billesbach unit is not underlain with as much productive Third Bromide Sand as it was mapped originally, and that the highest portion of the structure is located further south than originally mapped.

There is no evidence whatsoever that if the application is granted and Continental drills a well according to such application, that such well would interfere with the correlative rights of any interested owner. There is sufficient evidence, however, that if the application is not granted and the well is not drilled the correlative rights of all interested parties will not be protected and several thousand barrels of recoverable oil will be left in the ground.

We therefore hold that Continental sustained its burden of proof and the order denying the application to amend Order No. 38493 should be reversed.

**336**

We further conclude that Continental did make a proper record for review and we can not sustain the proposition that the cause should be dismissed for this reason.

This opinion shall not be construed as depriving the Commission of jurisdiction on further hearing to protect the correlative rights of persons affected by Order No. 38,493, or an order amending said Order, by regulating the amount of oil or gas that may be purchased from wells drilled in the area embraced by said Order or amended Order.

Order reversed.

WILLIAMS, C. J., BLACKBIRD, V. C. J., and HALLEY, JACKSON and BERRY, JJ., concur.

WELCH and JOHNSON, JJ., dissent.