**GMC OIL AND GAS CORPORATION,
Appellant,**

v.

**TEXAS OIL AND GAS CORPORATION
and Corporation Commission of the
State of Oklahoma, Appellees.**

**No. 50068.**

Supreme Court of Oklahoma.

Oct. 31, 1978.

---

6. See *Quirk v. Ross,* 257 Or. 80, 476 P.2d 559 (1970).

Gordon F. Brown, Verity, Brown & Verity, Oklahoma City, for appellant.

Eric R. King, Kimball, Wilson & Cook, Oklahoma City, for appellees.

WILLIAMS, Justice.

Oklahoma Corporation Commission (Commission) Order No. 84563, and others established 640 acre drilling and spacing units for the Unconformity Chester Lime, Tonkawa, Cottage Grove, Oswego-Big Lime, Cherokee-Red Fork and Atoka formations as found in the ten-section area in Township 21 North, Range 13 West, Major County with which we here are concerned. Texas Oil and Gas Corporation (TXO) filed an application with Commission requesting an exception to the spacing order or orders as applied to the Chester B in one of those sections, Section No. 14. This application was heard July 20, 1976, before the Commission en banc. Thereafter, Commission issued Order No. 123124 granting appellee, TXO permission to drill an off-pattern well in Section 14 subject to a 25% penalty on the regularly assigned allowable for the common source of supply for any production that might there be found (52 O.S.1971, § 87.1).

Appellant, GMC Oil and Gas Corporation (GMC) is the owner and operator of wells in sections 22 and 23 respectively situated to the southwest and south of Section 14. GMC appeals Order No. 123124 asserting (1) that their (GMC's) correlative rights in the common source of supply are not being protected by the Commission and (2) that Order No. 123124 is not supported by substantial evidence.

The testimony of the parties in hearing before the Commission was in conflict. Applicant's, appellee TXO's, evidence was of effect that Section 14 was underlain with oolithic carbonate as opposed to sand, quite compressed as opposed to being very porous, but containing considerable gas which could be economically recovered, especially under present conditions and at present prices, from a well located 660 feet from the west edge and 660 feet from the south edge of the section if permitted.

TXO's expert witnesses produced an isopach map said to demonstrate the correctness of their opinion that about 80 acres of the Chester B in the southwest corner of Section 14 was of 5% or greater porosity.

They testified concerning a previously drilled well located in the southwest quarter of that section that had been reopened and on test showed considerable gas but that had been shut down because of trouble with the hole. The proposed well, it was said, would be located on a "high" and would produce in an economic manner. One expert testified he knew of Chester B wells in Major County which did produce economically from 5% porosity areas.

GMC's president, on the other hand, testified that in his opinion an area of 5% porosity would not produce gas in an economic fashion; that not more than 40 acres or 6¼% of Section 14 was underlain by Chester B nonconformity oolithic; that a well drilled in the off-pattern location herein applied for would tend to drain the gas from Sections 15, 22 and 23 to the detriment of the owners thereof. He testified at one point that the proposed well would not hurt his company, that what he objected to was having to spend time and effort in defending off-pattern applications filed by TXO, that he had better things to do. (He said TXO had filed an application to drill an off-pattern well located in an irregularly shaped unit in Sections 7 and 8 which had been denied by the Commission and another in Section 20, which did not produce.) The witness did say a well located as TXO requested would eventually drain the whole involved area. The burden of this witness' testimony was of effect that for a well to produce economically it should be located where the porosity of the producing formation was 8% or greater; further that the porosity of the formation from which his Corporation's wells in 22 and 23 were producing was from 19 to 22%; that the Chester B did not feather out but cut off abruptly to the southwest of TXO's proposed well; that if TXO's proposed well hit the Chester B at all it would just corner it. He thought the TXO request to drill should be denied or such a well be penalized 100% (not be permitted to produce even if drilled and production found) or at least 93.75%. His map introduced in evidence illustrated the effect of his testimony.

Much of the testimony of the expert witnesses of both sides of the controversy went to the matter of whether liquids were present in the hole when tests were made, and as to information disclosed by Commission's records on gas pressures in, and accumulated production from the various existing wells and the like. Such evidence, of course, tended to favor the respective parties in whose behalf it was introduced.

This Court, in the light of the authorities hereinafter discussed, determines that, based upon the view it took of the evidence before it in this case, Commission was warranted in finding for applicant and in granting TXO permission in its Order No. 123124 to drill the off-pattern well requested in Section 14 above described. That portion of such order is supported by substantial evidence.

GMC asserts, and the Commission found, that hydrocarbons will be drained from underneath GMC's sections to an extent if TXO is allowed to drill the off-pattern location granted by the Commission. GMC argues that TXO has a "duty" not to take an undue proportion of oil and gas. It quotes from *Kingwood Oil Co. v. Hall-Jones Oil Corp.*, Okl., 396 P.2d 510 (1964):

The term "correlative rights" embraces the relative rights of owners in a common source of supply to take oil or gas by legal operations limited by duties to the other owners (1) not to injure the common source of supply and (2) not to take an undue proportion of the oil and gas.

However, it is to be recognized that this is a two-edged sword. *All* parties are prohibited from taking an unproportioned amount. The evidence was to the effect that if a well were not drilled at the off-pattern location of TXO's Section 14, the correlative rights of the concerned mineral owners in that 160-acre unit would not be protected because their available hydrocarbons would eventually be drained by GMC wells in adjoining sections.

The Commission is given express statutory permission to establish exceptions to spacing and drilling units (52 O.S.1971 § 87.1(b)(1)). The only way to protect the

correlative rights of all owners in the common source of supply is to establish a penalty on the regularly assigned allowable for the common source of supply (52 O.S.1971 § 87.1(b)(1)). What is the proper percent of penalty to be assessed against TXO creates the problem now presented to us.

■ This Court is limited in its scope of review of Corporation Commission appeals to the following extent:

In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Oklahoma Constitution Art. IX § 20.

Neither are we required to weigh and measure the evidence in an endeavor to determine its preponderance. Our duty ends with a finding that there is evidence of a probative value reasonably and substantially sustaining the Commission's finding and order. *Yellow Transit Co. v. State*, 198 Okl. 229, 178 P.2d 83 (1947).

■ Our task now is to review what the evidence was that prompted the Commission to determine that 25% penalty should be assessed and then determine whether this evidence is substantial.

A Mr. E, a geologist for TXO, prepared a combination structural contour isopach map which map represents that hydrocarbons are present under TXO's section. Mr. E further testified that the only economically sound location to drill on TXO's section would be in the proposed exception location and that 25% was the maximum penalty they could stand and still drill to recover their hydrocarbons.

Mr. C, district reservoir engineer for TXO also testified that the well should be drilled in the off-pattern portion of the section; that any other location in the section would result in too great a risk of having a low rate well due to the poor reservoir quality as shown by Mr. E's map and therefore would prove uneconomical. Mr. C also tes-

tified that 25% penalty against allowable would be the most that "we could stand". He testified further that he believed the pressures were undisturbed on TXO's section and therefore higher than the surrounding area. This he testified, would tend to drain the hydrocarbons toward TXO's Section 14. The penalty took this into account.

Considering the above evidence, although contradicted, we conclude the Commission's order was proper. Under our limited power of review, we are not authorized to make a comparison of evidence introduced by the respective parties before the Commission, nor are we authorized to weigh the evidence to see whether the order of the Commission is in accord with the weight of the evidence. *Creslenn Oil Co. v. Corporation Comm.*, 206 Okl. 428, 244 P.2d 314, 317 (1952).

We find there is substantial evidence to sustain the order.

ORDER AFFIRMED.

LAVENDER, V. C. J., and IRWIN, BERRY, BARNES, SIMMS, DOOLIN and HARGRAVE, JJ., concur.

HODGES, C. J., dissents.