John C. MILLER, Gardner B. Miller, Lawrence D. Miller Trust and Lawrence D. Miller, Jr., Appellants,

v.

CORPORATION COMMISSION of the State of Oklahoma, State of Oklahoma, and Kennedy & Mitchell, Inc., Appellees.

No. 53240.

Supreme Court of Oklahoma.

May 5, 1981.

As Corrected On Denial of Rehearing Nov. 5, 1981.

Brown & Lockhart by Gordon F. Brown, Oklahoma City, for appellants.

Harry C. Marberry, Oklahoma City, for appellees.

OPALA, Justice.

The sole issue presented is whether the Corporation Commission's [Commission] decision—establishing, in a forced pooling order, that a bonus of $75 per acre and a ⅛ royalty interest be paid mineral owners in lieu of participation—rests on substantial evidence. We answer in the affirmative.

The dispute arose in a proceeding on an application to pool the interests and adjudicate the rights of certain Ellis County mineral owners. The applicant, Kennedy and Mitchell, Inc. [operator], who sought the appointment as unit operator, requested that the Commission establish the bonus and royalty value of unleased mineral interests in the unit. Operator then held mineral leases on all tracts in the unit except the one owned by appellants [owners].

Testimony showed that the highest price paid for leases of privately-owned mineral interests in the unit was $75 per acre in bonus and ⅛ in royalty. According to the operator's witness, a landman, this represented the fair market level of value. It was brought out on cross-examination that the operator had paid a bonus of $101.81 and a royalty of ⅙ for a mineral lease of an 80-acre state-owned tract located in the same unit. This interest had been bought from the Commissioners of the Land Office through a sealed-bid process required by statute. 64 O.S. 1971 § 281.

The Commission granted the operator's application and set the bonus and royalty at the rate tendered by the operator. The owners appeal from that part of the order.

 When necessary to prevent waste and to protect the correlative rights of mineral owners, the Commission may use its statutory authority to force mineral owners to pool their interests. 52 O.S.Supp.1977 § 87.1. The cited statute is regarded as valid exercise of state police power in conserving natural resources.[1] The Commission has broad discretion in performing its statutory duties[2] and in determining what constitutes a just and reasonable compensation to the owners.

 This court's review of the Commission's findings of fact is restricted by the standard of substantial evidence.[3] Substantial evidence is that which possesses substance and relevance and will induce a conviction that the order made was proper. The prescribed standard may be met even though reasonable men could differ with respect to the result reached.[4]

As the record reveals a different price was paid for the mineral interest held by the state from that paid to private owners,

1. *Anderson v. Corporation Commission,* Okl., 327 P.2d 699, 702 [1957]; *Wakefield v. State of Oklahoma,* Okl., 306 P.2d 305, 307 [1957].

2. *Wakefield v. State of Oklahoma,* supra note 1; *Cameron v. Corporation Commission,* Okl., 414 P.2d 266, 271 [1966]; *Continental Oil Co. v. Corporation Commission,* Okl., 376 P.2d 330, 332 [1962].

3. Art. 9 § 20, Okl. Con.; *Texas Oil & Gas Corp. v. Rein,* Okl., 534 P.2d 1280 [1975]; *Ranola Oil Co. v. Corporation Commission,* Okl., 460 P.2d 415, 418 [1969].

4. *Cameron v. Corporation Commission,* supra note 2; *GMC Oil & Gas Co. v. Texas Oil & Gas Corp.,* Okl., 586 P.2d 731, 734 [1978]; *Central Okl. Freight Lines, Inc. v. Corporation Commission,* Okl., 484 P.2d 877, 879 [1971].

our task here is simply to determine if the *undisputed fair market value of privately-owned mineral leases* will satisfy the substantial evidence test.

■ The measure of compensation for forcibly pooled minerals is their "fair market value"[5]—the level at which this interest can be sold, on open-market negotiations, by an owner willing, but not obliged, to sell to a buyer willing, but not obliged, to buy.[6] Evidence of comparable terms and prices previously paid for leases in the same area is relevant to, but not always conclusive of, the fair market value. Other factors may command or merit additional consideration. The difference in lease terms, the distance from other leaseholds subject to forced pooling and the nature of formations within different leaseholds—to name but a few variants—may be of great moment.[7]

The value to be arrived at is that paid for comparable leases in the unit. It is best extracted from transactions under usual and ordinary circumstances which occurred in a free and open market.[8] The price levels reached under free and open market conditions are deemed to be barren of the distortive elements which are generally present in panic, auction or speculative sales. The latter so often reflect either depressed or inflated prices.[9] An open market transaction contemplates face-to-face negotiations between two or more parties, dealing at arm's length, for the purpose of arriving at an agreed level.[10]

The fair market value is one which can neither be inflated nor deflated by reference to special types of sales. The latter are not reflective of open-market conditions. A compulsory sale of an owner's interest in realty, when taken by eminent domain, is the most common example of a sale not made in the open market. It is said to be affected by special circumstances which do not exist in open market transactions.[11]

■ By its very nature, the sealed-bid process is incompatible with an open market sale.[12] Sealed bidding reflects the seller's

**5.** *Coogan v. Arkla Exploration Co.,* Okl., 589 P.2d 1061, 1063 [1979].

**6.** *Texas Oil & Gas Corp. v. Rein,* supra note 3; *Ranola Oil Co. v. Corporation Commission,* supra note 3; *Home-Stake Royalty Corp. v. Corporation Commission,* Okl., 594 P.2d 1207, 1209 [1979].

**7.** *Coogan v. Arkla Exploration Co.,* supra note 5.

**8.** *Coogan v. Arkla Exploration Co.,* supra note 5; see also *Xerox Corp. v. Board of Tax Review of City of Hartford,* 175 Conn. 301, 397 A.2d 1367, 1370 [1978]; *Bussie v. Long,* 286 So.2d 689, 704 [La.App.1974].

The fair market value test is also used to determine the value of land condemned for public purposes. 66 O.S.Supp. 1973 § 53; *State ex rel. Dept. of Highways v. Robb,* Okl., 454 P.2d 313, 315 [1969].

**9.** *Public Market of Portland v. City of Portland,* 178 Or. 367, 170 P.2d 586, 597 [1946]; *In re Board of Water Supply of City of New York,* 277 N.Y. 452, 14 N.E.2d 789, 792 [N.Y.1938]; *Howell v. State Highway Dept.,* 167 S.C. 217, 166 S.E. 129, 130–131 [1932]; *Kornegay v. City of Richmond,* 185 Va. 1013, 41 S.E.2d 45, 51 [1947].

**10.** *Guild Wineries and Distilleries v. Fresno County,* 124 Cal.Rptr. 96, 98, 51 Cal.App.3d 182, 185 [1975]; In *Harvey v. City and County of Denver,* 92 Colo. 114, 18 P.2d 321, 322 [1932] the court said that an open market transaction imports the act of buying, at the dealer's price, what he offers—as distinguished from presenting to the dealer a schedule of articles that are desired but in which the dealer may or may not deal directly and which he may be required to import or manufacture to some special design, and then asking him at what price he is able to meet the specifications that are needed.

An "arm's length" transaction is one which compares favorably with the usual course of action taken in the conduct of business within the trade. *Marcum v. Kentucky & I.T.R. Co.,* 363 S.W.2d 98, 100 [Ky. 1962]; see also *Bliss Hotel Company v. Thompson,* Okl., 378 P.2d 319, 321 [1963].

**11.** *Oklahoma Turnpike Authority v. Deal,* Okl., 401 P.2d 508, 511 [1965].

**12.** In *Albany Supply and Equipment Co. v. City of Cohoes,* 47 Misc.2d 312, 262 N.Y.S.2d 603, 605 [1965] the court said that "an open market is one open to all who wish to purchase at the vendor's prices, as contrasted, for example with the situation where a vendor submits bids, sealed or otherwise, for goods or services". In *Guild Wineries and Distilleries v. Fresno Coun-*

unwillingness to bargain openly in, and yield to the forces of, the open market place. Confrontational interaction of the buyer with the seller is thus avoided. The value obtained for property sold by this process cannot be said to represent the very same price as that which the property would bring if it were sold under the usual and ordinary circumstances. This is so because the sealed-bid process obviously operates to alter those "economic forces" at play which shape the fair market value. In short, the method by which the state is required by statute to exact a price for its leases is not *per se* co-incidental with the market process in action.

Evidence of the sale price of land may be proof of its economic value but it is not, under all circumstances, the sole criterion in ascertaining its fair market value. Special circumstances may be present which tend to indicate a value greater or less than the price paid.[13]

The statutorily mandated sealed-bid procedures for leasing state-owned minerals do not represent a sale in the open market. The price secured through that process, though not *per se* indicative of fair market value, may nonetheless be of relevance when it is coupled with some showing that it is co-extensive or co-incidental with fair market value. The record before us does not demonstrate any *nexus* between the sealed-bid price and a fair market value. The proof adduced simply fails to unveil *any* such connection. Moreover, the sealed-bid price was not offered below as *primary evidence probative of fair market value.* Rather, it was elicited on cross-examination in the hope of casting a cloud on the direct testimony of an adverse witness.

The Commission was free to weigh all the proof adduced and to find from it—as it doubtless did—that the price exacted by the state was not shown to affect the issuable fact—the fair market value of the owners' lease *qua* pooled mineral owners. The order is free from error and rests on substantial evidence.

Affirmed.

IRWIN, C. J., and WILLIAMS, LAVENDER, HARGRAVE and HODGES, JJ. concur.

BARNES, V.C.J., and SIMMS and DOOLIN, JJ., dissent.

SIMMS, Justice, dissenting:

I must respectfully dissent. I cannot agree with the majority's conclusion that the sealed-bid process is not reflective of open market conditions. The comparison to sales pursuant to eminent domain is particularly fallacious. It is not, as the majority suggests, the absence of face-to-face negotiations that makes condemnation sales incompetent to show fair market value in Oklahoma. In condemnation, the owner is forced to sell. It is this element of compulsion that so alters the economic forces in an open market.

In *Durell v. Public Service Co. of Oklahoma,* 174 Okl. 549, 51 P.2d 517 (1935), we distinguished a sale by condemnation from one on the open market, and said:

"In order for sales of other pieces of land to serve as an indication of the market value of the land in question, it seems

---

*ty,* supra note 10, the court said that an " 'open market' transaction is one where the sale price is negotiated between the buyer and seller as distinguished from a sale resulting from the submission of bids where the seller sells to the highest bidder or the buyer buys from the lowest bidder".

**13.** We are mindful of at least one instance where the tax assessment valuation of state-owned mineral rights was determined not to be the same as its purchase price [determined by the sealed-bid process] since that price was believed substantially inflated because of the

purchaser's lack of time to explore and test the property to determine its true value. *Allied Chemical Corp. v. Union County Board of Supervisors,* 511 S.W.2d 196, 198 [Ky.1974]. In another case called to our attention, a certain tract of land met all the special needs of the buyers who were willing to purchase that state-owned property at a premium price. Special circumstances like these may alter the economic forces that operate in a free and open market. *Department of Revenue v. Anaconda American Brass Co.,* 435 S.W.2d 65, 67 [Ky. 1968].

very clear that, to have that tendency, those other sales must have been made under circumstances where the *vendor was not compelled to sell at all events, but was at liberty to invite competition among those desiring to become purchasers."*

Those are the exact circumstances present when the state leases property by sealed bid pursuant to 64 O.S.1971, § 281. The state invites competition through bids, from all those who desire to purchase. The state is free to reject all. As the majority notes, prices of similar voluntary sales are admissible in Oklahoma to show fair market value (see notes 5 & 6). A sale by the state is no less voluntary merely because the state has the opportunity to choose from among several sealed bids.

To say that the sealed-bid process is the antithesis of the free market system is to ignore its basic purpose. It is designed to ensure that the state is able to take full advantage of all the benefits the open market offers. See, *A.A.B. Electric, Inc. v. Stephenson Pub. Sch. Dist. No. 303*, 5 Wash. App. 887, 491 P.2d 694 (1971); *Sulphur Springs Val. Elec. Coop. v. City of Tombstone*, 1 Ariz.App. 268, 401 P.2d 753 (1965).

Finally, the majority correctly cites the rule that values paid for comparable leases are only relevant when such sales occur on an open market, but then holds that state leases through the sealed-bid process may be relevant and admissible, although they do *not* represent a sale in the open market. I do not see how this conclusion can be logically supported.

I would hold that values paid to the state for minerals leased through the sealed-bid process are admissible to prove fair market value, to be considered by the Corporation Commission when offered, along with other competent evidence presented.

I am authorized to state that BARNES, V. C. J., and HODGES and DOOLIN, JJ., join in this dissent.