Hillsborough-southern judicial district
No. 93-288

THE STATE OF NEW HAMPSHIRE

v.

3M NATIONAL ADVERTISING COMPANY, INC.

January 31, 1995

*Jeffrey R. Howard,* attorney general (*Mark P. Hodgdon,* assistant attorney general, on the brief and orally), for the State.

*Devine, Millimet & Branch, P.A.,* of Manchester (*George R. Moore* and *James M. Costello* on the brief, and *Mr. Costello* orally), for the defendant.

HORTON, J. The defendant, 3M National Advertising Company, Inc., appeals an eminent domain decision by the Superior Court (*Conboy,* J.), reducing the awards of the board of tax and land appeals (BTLA). The defendant argues that the trial court failed to award just compensation

by: (1) not employing one of three generally recognized methods of appraisal valuation; (2) deducting post-taking, net rent from the awards; (3) holding that the signs were personal, not real property; and (4) failing to award compensation based on the defendant's expectation that the ground leases might be renewed. We affirm.

The defendant's interest in the property taken dates back to 1966, when it leased land bordering the F.E. Everett Turnpike in Merrimack and erected an outdoor advertising display sign facing traffic northbound into Manchester (Manchester sign). In 1971, the defendant leased additional land and erected a sign facing traffic southbound into Nashua (Nashua sign). The signs were located alongside one of New Hampshire's busiest roadways and were more than twice as large as those which could be constructed under current zoning. During the 1970s and 1980s, the defendant renewed the ground leases with succeeding property owners. In November 1989, the State filed declarations of taking against the signs. The ground leases then in effect had thirteen months left to run and lacked renewal options. The State removed the signs in August 1990. The defendant refused the State's initial offers to purchase the Manchester sign for $11,350 and the Nashua sign for $5,700. The BTLA awarded the defendant $46,600 for the Manchester sign and $28,700 for the Nashua sign, based in part upon a finding of value in the defendant's "inchoate interest to renew the lease." The State petitioned for reassessment of damages. RSA 498-A:27 (1983). In a *de novo* trial, the superior court refused to consider the defendant's expectation that the leases would be renewed, and reduced the awards to $16,940 for the Manchester sign and $15,500 for the Nashua sign. The defendant brought this appeal.

■ In this State, the owner of condemned property is entitled to damages based upon the difference in the fair market value of the property before and after the taking. *Edgcomb Steel Co. v. State*, 100 N.H. 480, 486, 131 A.2d 70, 76 (1957). Fair market value means "the price which in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." *Id.* at 487, 131 A.2d at 76 (quotation omitted).

Fair market value is generally determined by one of the following appraisal methods: (1) the market data approach, which establishes value on the basis of comparison with contemporaneous sales or offerings of similar properties; (2) the income approach, which establishes value on the basis of capitalized net income; and (3) the cost approach, where the appraiser determines the value of the land without the buildings and then adds to that sum the depreciated

current cost of reconstructing the buildings. *See Manchester Housing Authority v. Reingold*, 130 N.H. 598, 601, 547 A.2d 219, 221 (1988).

At trial, the State's expert valued each sign structure at $15,500 using the cost approach, and advanced that sum as the proper award. The defendant's expert, applying a version of the income approach, valued the Manchester sign and lease at $46,600 and the Nashua sign and lease at $28,700. Although the trial court approved of the parties' respective appraisal methods, it found that the State neglected to place any value upon the ground leases and that the defendant inappropriately based its income valuation upon a capitalization rate not derived from sales of single signs with short-term leases. These flaws in the parties' appraisals led the court below to conclude that "[g]iven the evidence presented at trial . . . the most appropriate method of arriving at the proper value for these properties is to add to the State's [cost] value of the physical structures the value of the leasehold interest in the unexpired . . . leases."

■ The defendant argues that adding together the separately computed values of the two property interests yields less than just compensation because this method does not reflect the value which the signs as built and as located adds to the leasehold. We agree that the property must be valued as a whole, but we find that the court's addition of separately computed values for the leases and the structures was an appropriate means to reach that value. The valuation of the property as a whole must reflect the extent to which it is available to the defendant, and that value is limited here by the brevity of the leaseholds and their uncertain renewal prospects. Therefore, the trial court's cost valuation of the signs coupled with the income value of the ground leases awarded all the value that could reasonably be expected to accrue to the defendant. *See* Annotation, *Condemnation Award for Billboard*, 73 A.L.R. 3D 1122 (1976 & Supp. 1994).

■ The trial court found that "the market value of the thirteen months left under the . . . leases is not readily ascertainable based on the evidence introduced at trial," and determined that the income value of the leases measured by actual net income to be received would be the most appropriate valuation method under the circumstances. We find no error or abuse of discretion in the trial court's decision to value the leasehold interest portions by their actual net income value. While actual net income value is a seldom used variation of the income method, it may be appropriate where, as here, the market value of the unexpired lease is difficult to ascertain because of its brief duration. *See* Annotation, *Condemnation Award for Billboard*, 73 A.L.R. 3D at 1131–32; *see also* 4 P. NICHOLS, THE LAW OF EMINENT DOMAIN

§ 12D.04[4] (rev. 3d ed. 1994) (tenant entitled to adequate compensation for pecuniary loss resulting from the taking).

The defendant also takes issue with the trial court's calculation of the actual value of the leases. In formulating the awards, the court measured the income due for sign rents from the time of the taking to the expiration of the leases, and subtracted the revenues received after the takings and the defendant's projected expenses in earning the sign rents not actually received. The awards equalled approximately four months' net rental income because both signs continued to be rented after the takings for nine of the thirteen months remaining on the defendant's leases.

■ The defendant contends that the trial court erred in deducting from the awards net rents received after the takings because such a calculation results in a market value based upon the date the signs were removed, rather than the date of taking. In this State, the defendant argues, fair market value is calculated as of the date of the taking. *See, e.g., Edgcomb Steel Co.,* 100 N.H. at 486–87, 131 A.2d at 76. The situation here, however, is not unlike a special benefit accruing to the defendant. We have held that where benefits inure to the condemnee, those benefits may be considered by the finder of fact as a reduction in damages and may be deducted or set off from the compensation award. *See Lebanon Housing Auth. v. National Bank,* 113 N.H. 73, 74, 301 A.2d 337, 339 (1973).

In the circumstances of this case, to award the defendant the full thirteen months' rent would allow the defendant to achieve a windfall at taxpayer expense. The State owned the property as of the date of taking. RSA 498-A:5 (1983); RSA 498-A:11 (1983 & Supp. 1994). To require the State to sue for the rents the defendant received after the takings would be contrary to notions of judicial economy. We hold that the defendant cannot recover both the fair market value of its leases as of the date of taking and the benefits of the leases until the signs are physically appropriated.

The defendant next argues that the trial court failed to award just compensation because it found that the signs were personal property, not real property. The defendant argues that section 4652 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA), 42 U.S.C. § 4652 (1988), applicable to eminent domain proceedings in this State, RSA 124-A:13, II (1990); *Appeal of Matthews,* 136 N.H. 221, 222, 614 A.2d 1061, 1062 (1992), mandates that its signs be treated as structures which must be valued as an integral part of the real property taken by the State. Section 4652 defines just compensation for "structures" like the defendant's signs as the greater of the amount by which the sign structures enhance the

real property, or the value of the structure in place and without regard to the State's acquisition of the fee:

> For the purpose of determining the just compensation to be paid for any building, structure, or other improvement . . . such building, structure, or other improvement shall be deemed to be a part of the real property to be acquired notwithstanding the right or obligation of a tenant, as against the owner of any other interest in the real property, to remove such building, structure, or improvement at the expiration of his term, and the fair market value which such building, structure, or improvement contributes to the fair market value of the real property to be acquired, or the fair market value of such building, structure, or improvement for removal from the real property, whichever is greater, shall be paid to the tenant therefor.

42 U.S.C. § 4652(b)(1). Although New Hampshire law distinguishes fixtures, which are real estate, from removable trade fixtures, which are personal property, it is not inconsistent with the URA in that "if personal property is condemned, the State must pay for it." *Edgcomb Steel Co.*, 100 N.H. at 490, 131 A.2d at 79; *cf.* 42 U.S.C. § 4652(b)(1).

▪ We need not disturb the trial court's finding that the signs were personalty because when it determined their fair market value, it did so without regard to the exact nature of the property interests condemned, noting that "the distinction [between realty and personalty] is not dispositive with regard to approach to valuation." We therefore find that the court's characterization of the signs as personalty did not prevent it from valuing the structures as an integral part of the property taken, as required by section 4652 of the URA and *Edgcomb Steel Co.*, 100 N.H. at 490–91, 131 A.2d at 79.

▪ Finally, the defendant argues that the trial court failed to award just compensation by limiting the value of the property interests taken to the remaining term of the leases. The defendant relies upon *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973), which held that "just compensation" may include compensation for a lessee's expectancy in the continued use of an improvement beyond the remaining term of the lease. *Id.* at 474. In *Almota*, the Court distinguished *United States v. Petty Motor Co.*, 327 U.S. 372 (1946), which reasserted a long line of cases establishing that an expectancy in the continuation of a lease does not constitute a compensable property interest. *Almota*, 409 U.S. at 476; *see Petty Motor Co.*, 327 U.S. at 380 n.9. *Almota* held that the expectancy is inherent in the improvement, rather than in the lease. Therefore, in determining

the fair market value of an improvement on leased land, a court must consider the prospects for use over the improvement's useful life. Courts should "value the improvements in place over their useful life—taking into account the possibility that the lease might be renewed as well as the possibility that it might not." *Almota*, 409 U.S. at 474. Thus, we must distinguish between leasehold improvements and the underlying leasehold interest when determining whether the possibility of lease renewal should be considered part of the award. *United States v. 27,223.21 Acres of Land, Las Animas County*, 589 F. Supp. 1121, 1126 (D. Colo. 1984). Where, as here, both the improvement and the lease interest are taken, we must determine whether the value of the expectancy interest is derived from the improvement, in which case it is compensable, or the land lease, in which case it is not.

 *Almota* involved the taking of grain elevators constructed next to a railroad on land leased from the railroad. The land and improvements were taken for the construction of a dam. Both the railroad and the elevator operators were entitled to compensation. The Supreme Court held that the land lessee elevator operators were entitled to compensation for the remaining term of the lease and for a term in expectancy up to the useful life of the improvements that it owned based on the fair market value. *Almota*, 409 U.S. at 474–75. The Supreme Court noted some factors that vested expectancy value in the improvements, including the substantial nature of the improvements, the absence of the practical option of removal, and the symbiotic relationship between the lessor railroad and the operation of the improvement. *Id.* The elevators were operated for the storage of grain to be transported by the railroad. The lease would be renewed as long as the railroad wanted the business. *Id.* Under these circumstances, the Court found that a compensable expectancy interest inhered to the improvement. *Id.*

In this case, the defendant's appraisal claimed a compensable expectancy interest in the condemned properties as a whole, land leases and improvements. In contrast, the State's appraisal was based entirely on the cost basis of the signs, without regard to the land leases. The trial court, however, properly separated the two interests. It found no compensable expectancy interest in either the leases or the improvements. In relation to the land leases, such a finding was correct and consistent with *Almota*. *Almota*, 409 U.S. at 476; *Petty Motor Co.*, 327 U.S. at 375; *Ranlet v. Railroad*, 62 N.H. 561, 563 (1883). In relation to the improvements, the defendants, on appeal, assert that *Almota* requires a finding of an expectancy interest. *Almota*, 409 U.S. at 478. We disagree.

The improvements in this case are unlike those in *Almota. See Whiteco Industries, Inc. v. City of Tuscon*, 812 P.2d 1075, 1077 (Ariz. App. 1990); *Matter of Minneapolis Com. Dev. Agency*, 417 N.W.2d 127, 131 (Minn. App. 1987). They are not permanent buildings, but removable trade fixtures. Not only did the parties so define them in the land leases, but the trial court also found them to be personal property. Their maintenance creates no symbiotic relationship with the land lessor beyond the benefits bestowed on the land lessor by the land leases. Any value to an expectancy in this case is related to location, which is uniquely a function of the land, and any injury thereto is a claim for the landowner to assert. The trial court correctly rejected the claim of value for expectancy of renewal on the sign improvements and properly valued the damages for the taking of the improvements.

*Affirmed.*

All concurred.