1999 OK CIV APP 111

### WESTERN FARMERS ELECTRIC COOPERATIVE, Appellee,

v.

### Otho and Mary Etta ENIS, Husband and Wife, Appellants.

### Nos. 90,413, 90,414.

Court of Civil Appeals of Oklahoma, Division No. 2.

July 20, 1999.

Certiorari Denied Nov. 20, 1999.

sues arise from consolidated appeals by landowners Otho and Mary Etta Enis, and Mary Karen Long. Both the Enises and Ms. Long assert that they are aggrieved by the trial court's exclusion of their proffered evidence concerning: (1) an earlier right-of-way sale by the Enises to a pipeline company; (2) the diminishing effect on property value due to public fear of the electromagnetic fields from high voltage lines; and (3) the disparate use of the easement on their properties by Western cutting down more trees on their properties as compared to other properties along the line. The Enises and Ms. Long contend that such evidence was relevant for the jury to consider in determining their damages. They argue that the erroneous exclusion of this evidence resulted in excessively low jury verdicts that were less than half of the damages assessed by the court-appointed commissioners. Upon review, we agree that (1) all of this evidence was relevant to the issues of value; (2) the relevance of this evidence was not outweighed by any prejudicial effect it may have; and (3) its exclusion was prejudicial to the landowners' right to establish their claim for just compensation for the easement and damage to the remainder.

### I.

¶ 2 The trial court granted a motion in limine presented by Western that sought to exclude evidence concerning the Enises' negotiated sale of a right-of-way easement to ARKLA Energy Resources for a pipeline in 1990. The ARKLA right-of-way was located on the same property as the Western easement. The motion in limine cited *Oklahoma Turnpike Authority v. Deal*, 1965 OK 57, 401 P.2d 508, in support of Western's argument that "[a]ny evidence relating to prices paid by other condemners for other easements is not admissible to ascertain the value of the damage to land taken in this case." In response, landowners argued that the case of *Coogan v. Arkla Exploration Co.*, 1979 OK 6, ¶ 11, 589 P.2d 1061, 1063, limited the exclusionary rule in *Deal* to "evidence of the price paid for other tracts in condemnation proceedings." The trial court indicated that *Coogan* was not helpful, even in its discussion of *Deal*, because *Coogan* dealt with negotiat-

Roger Wiley, McAlester, Oklahoma, for appellee.

Eric R. King, David L. Kearney, Gable, Gotwals, Mock, Schwabe, Kihle & Gaberino, Oklahoma City, Oklahoma, for appellants.

REIF, J.

¶ 1 The issues presented for decision concern the admissibility of certain evidence in condemnation proceedings brought by Western Farmers Electric Cooperative to acquire easements for a high voltage line. The is-

ed sales of oil and gas leases prior to initiation of forced pooling proceedings. The trial court felt that there was a significant difference between acquiring leases before initiating forced pooling and acquiring easements prior to initiating condemnation. In addition, the trial court found the rationale behind *Deal* to be consistent with his own experience that acquisitions of power line and pipeline easements do not represent market sales between a willing buyer and a willing seller.

¶3  In reviewing the *Deal* and *Coogan* cases, we believe that the supreme court did not apply the rule in *Deal* to the *Coogan* situation for the very reason suggested by landowners—the exclusionary rule in *Deal* does not apply to negotiated sales that are "not the result of a legal proceeding" by the condemner. The *Deal* case held that "the amount of money [another landowner] had received from the [condemner] Authority for settling his claim against the Authority, was incompetent and inadmissible." 1965 OK 57 at ¶19, 401 P.2d at 512. *Deal* based this holding on *Durell v. Public Service Company of Oklahoma,* 174 Okla. 549, 51 P.2d 517 (1935). The pertinent portions of *Durell* that were cited in *Deal* state:

> On trial of action to determine damage to land taken by eminent domain, evidence of condemnation prices paid for other tracts is incompetent.
>
> . . .
>
> What the party condemning has paid for other property is incompetent.

*Deal,* 1965 OK 57 at ¶16, 401 P.2d at 511. Clearly, it is prices paid *by a condemner* for neighboring lands that are incompetent and excluded, and not all sales between a landowner and another party who merely possesses the power of condemnation.

¶4  *Coogan* specifically notes that "the value of land or interest in realty at a

particular time may as a general rule be proved by evidence of *voluntary* sales of similar property in the vicinity made at or about the same time." 1979 OK 6 at ¶12, 589 P.2d at 1063 (emphasis added) (citations omitted). If a landowner can show that a sale of land or interest in land to another party was voluntary, it does not per se taint the sale simply because the party who purchased the land or interest had the power of condemnation. At most, it simply raises a rebuttable presumption with the burden on the landowner to show a voluntary sale.

¶5  The offer of proof made by Mr. Enis at the hearing on the motion in limine indicates that he would testify that "he negotiated an arms-length transaction between a willing buyer and a willing seller, with ARK-LA, [for a pipeline easement] on property that he owns that is adjacent to and abuts Karen Long's property." The offered proof further indicated that "condemnation was never mentioned as a part of any of his conversations and negotiations with the ARKLA representatives." This is a prima facie showing of voluntariness for which the Enises and Ms. Long should have another day in court to establish.[1]

## II.

¶6  The trial court also granted another request in the Western motion in limine that sought exclusion of evidence concerning public fear of electric lines due to electromagnetic fields (EMFs). The motion in limine argued that the depositions of the landowners and their expert appraiser "reveal their lack of any knowledge or information concerning electromagnetic fields which would be even remotely relevant to the issues to be tried in this case." The motion focused on deposition testimony by the landowners and the expert where they could not name anyone who had

1. In contrast, where a landowner granted two easements without "consult[ing] with an attorney, and ... to prevent condemnation [having been] informed," that the right-of-way would be condemned," such grants were the type of "evidence of the prices paid for other tracts in condemnation [that] is incompetent." *Cities Service Gas Company v. Beck,* 1975 OKCIVAPP 16, ¶¶8, 11, 534 P.2d 27, 28. In the *Cities Service* case, condemner Cities Service sought to use evidence of the price paid by another pipeline condemner for an easement on the same land as the Cities Service easement. Clearly, the reason such evidence was excluded was that the *actual* compulsion of condemnation was present in the prior sales, and not just a sale to a party with the power to condemn.

expressed fear of electric lines due to EMFs. The EMF portion of the motion concluded by emphasizing that the landowners and their appraisal expert "would [not] be able to provide any relevant evidence ... regarding the existence, presence or impact of electric and magnetic fields [and had] no evidence that electromagnetic fields have impacted the fair market value of this or any other property." In response, landowners cited case authority recognizing their right to show "a perceptible fear on the part of the general public" that adversely affects the value of land and that "public fear" can be proven by an appraisal expert's knowledge of publicly disseminated information about potential danger. In granting the motion, the trial court interpreted landowners' cases as allowing evidence of public fear of "well known established dangers [but] not speculating dangers."

¶ 7    In reviewing the case authority on public fear relied on by landowners, we do not believe that it has the restricted application to "well known established dangers" that the trial court determined. In *Root v. KAMO Electric Cooperative, Inc.*, 1985 OK 8, ¶ 21, 699 P.2d 1083, 1088, the supreme court rejected the power company's challenge to "the testimony of one witness who testified that the general public's fear of overhead transmission lines was one of the factors he considered in reaching his valuation of the land." In *Root*, the supreme court either cited approvingly or acknowledged most of its prior case law. The court stressed its prior recognition that "[t]he danger attending the presence of wires carrying high voltage is a matter of common knowledge [and] such evidence [i.e., the common knowledge of danger] is competent as hearing on the depreciation in the market value of property over which the easement is taken and the power line is constructed." *Id.* at ¶ 22, 699 P.2d at 1088 (citations omitted) (footnote omitted). The court found no error in admitting the "expert witness' testimony, which took into account the depreciation in the value of the land near the transmission right of way occasioned by a perceptible fear on the part of the general public." *Id.*

¶ 8    By using the terms "perceptible fear on the part of the general public" and "com-

mon knowledge," we believe the court was acknowledging that publicized information that has been generally circulated about a danger, potential hazard or even a suspected harm associated with the use of a power line easement can be considered by an expert in forming an opinion concerning the valuation of property, and, ultimately, by a trier of the fact. In the case of *Arkansas Louisiana Gas Company v. Cable*, 1978 OK 133, ¶ 14, 585 P.2d 1113, 1116, the court held that it was proper for an expert appraiser to rely on newspaper articles to show pipelines explode to support his opinion about the diminution in value on the remainder of land over which a pipeline easement was condemned. The court observed that the "witness was neither testifying that pipelines do explode, nor testifying to accuracy of newspaper reports [but was recounting reasons and information] to show a prevailing local market condition." The court concluded "[t]his was within his competence as an expert." *Id.* We believe the court was referring to the assessment of the impact of publicized information concerning the use of an easement on value when it said *this* was within his competence as an expert.

■    ¶ 9    The trial court's view that fear of only "well known established dangers" can be a factor or element of damage reflects the "intermediate" or the "reasonable fear" approach to the use of evidence of fear in assessing diminution of value to the remainder of property. *See Willsey v. Kansas City Power & Light Co.*, 6 Kan.App.2d 599, 631 P.2d 268, 273 (1981); *see also*, Vitants M. Gulbis, Annotation, *Fear of Powerline, Gas or Oil Pipeline, or Related Structure as Element of Damages in Easement Condemnation Proceeding*, 23 A.L.R.4th 631 (1983); and *City of Santa Fe v. Komis*, 114 N.M. 659, 845 P.2d 753 (1992). The other approaches are the so-called "majority rule" that does not recognize fear as a factor or element of damages, and the so-called "minority rule" that allows compensation for loss in value based on fears without proving the reasonableness of the fear. *Id.* Both the Kansas Court of Appeals and the author of the annotation construe Oklahoma cases as placing Oklahoma in the "minority rule" category allowing compensation without proving

the reasonableness of the fear. Based on our review of Oklahoma cases, we agree with the Kansas Court of Appeals and the author of the annotation. Indeed, Oklahoma represents what might well be termed the "perceived fear" rule.

¶ 10 In *Komis*, the New Mexico Supreme Court adopted the minority, perceived-fear approach. The court characterized this rule as allowing "compensation ... for loss of market value even if the loss is based on fears not founded on objective standards." 845 P.2d at 756. They noted that the "objective in a condemnation case is to compensate the landowner for damages actually suffered [and] if loss can be proven, it should be compensable regardless of its source." *Id.* The court reasoned that "if people will not purchase property because they fear living or working on or near a [use made of property taken in condemnation] or if a buyer can be found, but only at a reduced price, a loss of value exists." *Id.*

¶ 11 As concerns EMFs, one court has held that "the truth or lack of truth in whether electromagnetic projections caused a health hazard to humans or animals [is] immaterial [because] the question [is] whether the fear of the danger existed and would affect market value." *San Diego Gas & Electric Co. v. Daley*, 205 Cal.App.3d 1334, 1348, 253 Cal.Rptr. 144, 152 (1988).

¶ 12 An expert appraiser's opinion about the impact on value of perceived fear of EMFs based on publicly disseminated information is a relevant factor in determining fair market value. The generally accepted definition of fair market value is "[t]he amount at which property would change hands between a *willing* buyer and a willing seller, neither being under any compulsion to buy or sell and both *having reasonable knowledge of relevant facts.*" Black's Law Dictionary 537 (5th ed.1979) (emphasis added). It has also been defined as the price which a "well-informed buyer" would pay a "well-informed seller" when neither is obliged to enter into the transaction. *State v. Sherrill*, 13 Wash.App. 250, 534 P.2d 598, 601 (1975). "[I]n ascertaining [fair market value between willing buyers and sellers,] 'there should be taken into account all con-siderations that fairly might be brought forward and reasonably be given substantial weight* in such bargaining.' " *Karlson v. U.S.*, 82 F.2d 330, 337 (8th Cir.1936) (citations omitted); *State v. 3M Nat. Advertising Co.*, 139 N.H. 360, 653 A.2d 1092, 1094 (1995); and, *Edgcomb Steel of New England, Inc. v. State*, 100 N.H. 480, 131 A.2d 70, 76 (1957).

¶ 13 The "considerations" that go into fair market value include "*any factors* which a reasonably prudent buyer would consider before purchasing property," *State by and through Alabama State Docks Dept. v. Atkins*, 439 So.2d 128, 131 (Ala.1983), and "*all elements* reasonably affecting value." *Wright v. Metropolitan Atlanta Rapid Transit Authority*, 248 Ga. 372, 283 S.E.2d 466, 469 (1981). Fair market value should also reflect "all favorable and unfavorable circumstances." *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P.2d 301, 304 (1937); and, "any competent evidence of *matters* which would be considered by prospective vendor or purchaser or *which tend to enhance or diminish value of property.*" *Douglas County Bank & Trust Co. v. Stamper*, 244 Neb. 226, 505 N.W.2d 693, 696 (1993).

¶ 14 Fear based on publicly disseminated information about EMFs is not only a factor or element a buyer would consider in determining value, but is also a factor that affects willingness. Beyond question, fear makes people who entertain the fear less willing to act in relation to the thing feared. Generally, the only thing needed to produce fear is some connection between a familiar harm and a *potential* source of the harm. That is, people need only believe that if they are exposed to the *potential* source of harm that they will likely be harmed. Fear, then, makes people less willing to expose themselves to things that they believe will harm them. When information is publicly disseminated that something has the potential for causing harm, it follows that such information will produce fear, or at least a reluctance, for association with the source of the potential harm.

¶ 15 Publicly disseminated information that harm can potentially result from the

presence of a high voltage power line on land can be expected to make people less willing to expose themselves to land with high voltage power lines. It follows that people who are less willing to be exposed to such potential harm can be expected to place less value on land that contains the potential source of harm. They can also be expected to discount any fear of harm only when the benefits they receive from owning the land outweigh their fear or belief that harm can potentially follow. There is little doubt, however, that they will value the land with the potential source of harm *less* than they will value land that does not have the feared, potential source of harm.

¶ 16　Unfortunately, the effect of fear on the willingness of a buyer to purchase a piece of land is not easily assessed or measured, but the same is true of other intangible factors such as aesthetic qualities of land. The difficulty in quantifying or valuing fear should not prevent both parties from offering available evidence to show that certain fears either do or do not have an effect on the value of property. The *Komis* case provides an excellent review of the various types of evidence that are helpful in proving or disproving whether perceived fear has an impact on the value of property.

¶ 17　Under the minority rule, "[t]he parties' evidence and arguments are limited to the existence of fear, its prevalence, and its effect on market value, if any." *Willsey,* 631 P.2d at 279. Under either the "intermediate reasonable fear" approach or the "minority perceived fear" rule "neither the owner nor anyone else may base an opinion of value on personal fear ... admissible [evidence] is an opinion of value of a qualified witness based on the existence of fear in the buying public in general which affects market value." *Id.* at 280. "[T]he expert [does] not attribute a dollar figure to the element of fear [and] the jury makes no specific allowance for separate items of damage." *Id.*

¶ 18　At the hearing on the EMF portion of the motion in limine, the landowners made an offer of proof concerning the evidence they proposed to rely upon. Landowners indicated that Ms. Long would sponsor various newspaper articles and publicly available materials relating to the electromagnetic field issue that she collected over the years. These items included:

> Exhibit 10: Paul Brodeur, The Great Power-line Cover-up: How The Utilities And The Government Are Trying to Hide The Cancer Hazards Posed by Electromagnetic Fields (Little, Brown and Company);

> Exhibit 11: M. Granger Morgan, *Electric And Magnetic Fields From 60 Hertz Electric Power: What Do We Know About Possible Health Risks?* Department of Engineering and Public Policy, Carnegie Mellon University, Pittsburg, PA (1989);

> Exhibit 13: Maryalice Yakutchik, *A new jolt of concern ("power lines are linked to cancers, depression and leukemia"),* USA Weekend, Jan. 1–3, 1993, at 5–12;

> Exhibit 14: Doug Levy, *Power lines' link to brain cancer, But no tie found with leukemia,* USA TODAY, Jan. 11, 1995;

> Exhibit 15: *Magnetic field hazards eyed,* McAlester News–Capital Democrat, Feb. 28, 1993;

> Exhibit 16: Bill Richards, *Elusive Threat: Electric Utilities Brace for Cancer Lawsuits Though Risk is Unclear,* Wall Street Journal, Feb. 5, 1993; and,

> Exhibit 17: Alix M. Freedman, *Power Lines Short–Circuit Sales, Homeowners Claim,* Wall Street Journal Marketplace, Dec. 8, 1993, at B1.

¶ 19　The offer of proof made it clear that the purpose of Ms. Long's testimony and sponsorship of these items was *not* to show EMFs cause cancer but "simply to demonstrate that a portion of the general public ... potential purchasers ... might take *that* [i.e., the publicly disseminated information about EMFs] into account in determining whether or not they would buy [and to show] the perception created by these articles would impact the marketability of her property." The offer of proof indicates that Ms. Enis would similarly testify.

¶ 20　The offer of proof further indicates that landowners' expert would testify that "he would have taken *that* [i.e., the publicly disseminated information about EMFs] into

account in making his appraisal" and that "he believes the property has been devalued by the presence of the high voltage line on the property because of the perceptible fear of the general public relating to high voltage lines."

¶ 21 Landowners' offer of proof makes an adequate prima facie showing of "the existence of fear, its prevalence, and its effect on market value." *Willsey*, 631 P.2d at 279.

## III.

¶ 22 The final issue in this case concerns the trial court's exclusion of evidence that Western cut more trees on the Enis and Long properties in the installation of the power line than it did on other properties. The trial court ruled that how and why Western cut trees on other property was not relevant to the jury's assessment of damages for Western's removal of trees both within and outside the easement across the Enis and Long properties. Landowners have argued that evidence of disparate treatment is admissible to prove their damages and to impeach the Western explanation that it cut trees on the Enis and Long properties only as needed for construction or safety purposes.

¶ 23 Once again, we agree with landowners. Landowners who are burdened by a power line easement still enjoy non-interfering uses both within and immediately adjacent to the easement, such as the benefit of trees. If Western did cut down trees unnecessarily either inside or outside the easement, such action results in damage to the remainder. One of the ways for landowners to prove they have been damaged by removal of trees is to show the removal was unnecessary. One of the ways that landowners can show removal of trees may have been unnecessary on their land is to show that the party removing the trees under a claim of necessity did not remove trees from other properties under similar circumstances.

## IV.

¶ 24 "Exclusion of evidence constitutes reversible error if it affects a substantial right of a party and the substance of the tendered evidence was … made known to the judge by offer." *Matter of C.M.G.*, 1982 OK 156, ¶ 12, 656 P.2d 262, 266. In *C.M.G.*, the court concluded that proffered evidence of non-cash support of C.M.G. was "critical" to the respondent mother's defense to avoid termination of her parental rights and, therefore, "was erroneously excluded to her prejudice." *Id.* at ¶ 14, 656 P.2d at 267.

¶ 25 Oklahoma has long recognized that "[i]t is reversible error to refuse to receive competent evidence in the trial of a cause offered by a party to the action, in support of a material allegation." *Knox v. Champlin Refining Co.*, 172 Okla. 396, 45 P.2d 119, 120 (1935) (syllabus 1). In *Knox*, the defendant-producer contended he did not receive proper credit on the repayment of a cash advance by Champlin. The credits toward repayment were to be calculated on the basis of a posted price. Defendant-producer sought to prove that Champlin did not follow its posted price by evidence that it paid different prices to different producers. The defendant-producer appealed the trial court's rulings that sustained objections to questions which tended to prove discrimination in prices paid. The supreme court ruled that this was reversible error because it "deprived defendant of a trial upon his theory of the case." *Id.* at 119. The court explained its ruling as follows:

> [W]e think that more latitude should have been indulged by the trial court in permitting the defendant to show *all the material facts* bearing upon his theory of recovery. The proffered testimony seems to us to be germane to the issues involved, and material as tending to prove [the defendant's position].

*Id.* (emphasis added). The supreme court reversed because "defendant was not given a fair and reasonable opportunity to show by competent evidence [his theory of the case]." *Id.*

¶ 26 *Mud Products, Inc. v. Gutowsky*, 1954 OK 234, 274 P.2d 389, 390 (syllabus 3), similarly explains that reversal is warranted where "exclusion deprived plaintiff of a fair opportunity to support his cause of action by relevant and competent testimony." In the *Mud Products* case, the excluded evidence directly affected the outcome of a "pivotal question" in the case. It was reversible er-

ror to exclude relevant testimony, when it was offered. The court noted that the proffered testimony had an important bearing upon the main fact question in the case.

¶ 27  In a case where the value of an asset was a pivotal question, the Oklahoma Supreme Court has expressly ruled that "[i]t was prejudicial error to exclude defendant's evidence which might have shown ... value." *Fourth Nat'l Bank of Tulsa v. Dyer,* 1960 OK 66, ¶ 12, 350 P.2d 481, 483. Similarly, in *Gustin v. Meadows,* 1974 OKCIVAPP 12, ¶ 28, 521 P.2d 429, 433, the court held "[t]he evidence excluded ... deprived the [party] of the fundamental right to prove a substantial part of [the] damages [and] such exclusion was prejudicial to the extent of constituting reversible error."

¶ 28  In the instant case, landowners' proffered evidence concerning (1) the negotiated sale of another public utility easement across their land, (2) the impact of a perceptible fear on the part of the general public concerning EMFs from high voltage power lines, and (3) the lack of necessity to cut trees for the power line, had a bearing upon the "critical," "pivotal," "main fact question" of the damages sustained by landowners from the taking of the easement and diminution in value of the remainder. Like the court in *Knox,* 45 P.2d at 119, "we think more latitude should have been indulged by the trial court in permitting the defendant[s] to show all the material facts bearing upon [their] theory of the case." We similarly conclude, as did the court in *Gustin,* 1974 OKCIVAPP 12 at ¶ 28, 521 P.2d at 433, that "the evidence excluded ... deprived the [landowners] of the fundamental right to prove a substantial part of [their] damages [and] such exclusion was prejudicial to the extent of constituting reversible error."

¶ 29  Accordingly, the judgment on the jury verdict herein is REVERSED AND REMANDED TO THE TRIAL COURT FOR A NEW TRIAL.

BOUDREAU, V.C.J., and STUBBLEFIELD, P.J., concur.

