2017 OK CIV APP 60

**KAMO ELECTRIC COOPERATIVE, INC., a Rural Electric Cooperative Corporation and K-Powernet, LLC, an Oklahoma Limited Liability Company, Plaintiffs/Appellants,**

v.

**Curtis L. NICHOLS and Lori D. Nichols, Husband and Wife, Defendants/Appellees.**

Case Number: 114940

Court of Civil Appeals of Oklahoma, Division No. 4.

Decided: 09/11/2017

Mandate Issued: 11/14/2017

Stratton Taylor, Clint Russell, TAYLOR, FOSTER, MALLETT, DOWNS, RAMSEY & RUSSELL, Claremore, Oklahoma, for Plaintiffs/Appellants.

K. Ellis Ritchie, K. ELLIS RITCHIE, P.C., THE RITCHIE LAW FIRM, Pryor, Oklahoma, for Defendants/Appellees.

Paul F. Burdeaux, AMERICAN ELECTRIC POWER SERVICE CORPORATION/PUBLIC SERVICE COMPANY OF OKLAHOMA, Dallas, Texas, for Amicus Curiae Public Service Company of Oklahoma.

Justin Sullivan, ENABLE MIDSTREAM PARTNERS, LP, Oklahoma City, Oklahoma, for Amicus Curiae Enable Midstream Partners.

Brian W. Hobbs, WESTERN FARMERS ELECTRIC COOPERATIVE, INC., Anadarko, Oklahoma, for Amicus Curiae Western Farmers Electric Cooperative, Inc.

**P. THOMAS THORNBRUGH, VICE-CHIEF JUDGE:**

¶1 Appellants, Kamo Electric Cooperative, Inc., and K-Powernet, LLC, appeal the result of a condemnation trial awarding Appellees compensation of $30,615 for an easement across 3.9 acres of rural land. On review, we reverse this decision and remand for further proceedings.

## BACKGROUND

¶2 Kamo and K-Powernet sought a power line/telecommunications easement across approximately 3.9 acres of rural land that was used primarily for cattle. The parties were unable to agree on a negotiated price, and a condemnation proceeding ensued. The appointed commissioners found that the value of the property taken, plus damages to the remainder, totaled $20,000. Both parties objected, and the matter went to trial. During pre-trial and trial proceedings, the admissibility of the testimony of Appellees' expert, Matt Earnest (Appraiser) was a major issue. The parties appear to have been in broad agreement that the general fee simple purchase price of similar agricultural land was in the region of $2,000 per acre. Appraiser opined, however, that the 3.9 acres taken was worth approximately $8,000 per acre, based on the negotiated acquisition price of similar easements by public utilities in the area, rather than sales of similar property for agricultural or domestic use.

¶3 Appellants objected to the admissibility of this testimony, but the trial judge found it admissible. The jury found just compensation for the taking to be $30,615, approximately $7,800 per acre. Appellants filed a motion for new trial, which was denied. Kamo and K-Powernet now appeal this decision on the grounds that Appraiser's testimony was inad-

missible because his methodology was faulty. The *Amici* noted above have filed a joint brief in support of Kamo's position.

## STANDARD OF REVIEW

¶4 Appellate review of a motion for a new trial where the trial judge presided at the trial, heard the testimony, observed the witnesses, and had full knowledge of the proceedings is one of abuse of discretion. *Gowens v. Barstow*, 2015 OK 85, ¶11, 364 P.3d 644. An abuse of discretion occurs if a decision is based on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling. *See Smith v. City of Stillwater*, 2014 OK 42, ¶¶10-11, 328 P.3d 1192. The conclusions of law in a condemnation case are subject to the *de novo* standard of review. *State ex rel. Dep't of Transp. v. Little*, 2004 OK 74, ¶10, 100 P.3d 707. *De novo* review is "plenary, independent and nondeferential." *Id.* (footnote omitted).

## ANALYSIS

### I. THE APPLICABLITY OF *DAUBERT* TO APPRAISER'S TESTIMONY

¶5 Appellants and *Amici* frame the evidentiary question in this case primarily in *Daubert* terms. The Amicus Brief goes so far as to argue that the result should be reversed because the court did not make the detailed *Daubert* findings required by certain federal courts. We find, however, little or no applicability of the core *Daubert* principles to this case.[1] The question of what appraisal methods give rise to admissible evidence in an Oklahoma condemnation action is typically one of **Oklahoma common law** and our **constitutional requirement of just compensation**, rather than one of scientific validity.[2]

---

1. "[A] *Daubert* hearing is not required in every circumstance when a party makes an objection and argues for application of *Daubert*." *Andrew v. Depani-Sparkes*, 2017 OK 42, 396 P.3d 210 (citing *Day v. State*, 2013 OK CR 8, ¶¶4-9, 303 P.3d 291 and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

2. By example, Oklahoma hews to the doctrine that a property owner is competent to value his or her own property, and deems such evidence

admissible. *State ex rel. Dept. of Transp. v. S & S Prop.*, 1999 OK CIV APP 130, ¶31, 994 P.2d 75. This method of valuation almost certainly *could not* withstand a challenge based on the traditional *Daubert* factors. Other methods of appraisal that have *no evident scientific error* are barred by the common law from use in some situations but allowed in others. Indeed, one argument in this case is that a "gross income multiplier" method, which *will* pass *Daubert* scrutiny as a generally accepted appraisal technique and has been used

¶ 6 The genesis of what are commonly referred to as the *"Daubert* factors" came in a case that involved "core" scientific testimony. In *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the question was whether expert testimony that a mother's prenatal ingestion of the prescription drug Bendectin was the cause of birth defects was admissible. In this context, the U.S. Supreme Court stated a number of considerations that go to the basic reliability of scientific testimony, including whether the methodology can be (and has been) tested; whether the theory or technique has been subjected to peer review and publication; and the known or potential rate of error inherent to the methodology. These factors fit well in a conventional scientific field such as medicine, which has a tradition of published research, repeatable results obtained pursuant to the scientific method, and peer review. The *Daubert* test remains an excellent gauge of the reliability of this type of testimony.

¶ 7 In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that *Daubert's* "gatekeeping" obligation, requiring an inquiry into both relevance and reliability, applied not only to "scientific" testimony, but to all expert testimony. The immediate problem, recognized by the Court in *Kumho Tire,* was that the factors identified in *Daubert* were specifically adapted to traditional "hard" science, and may not have any applicability in other specialist fields. Unfortunately, the *Kumho Tire* Court gave little guidance as to what factors should be considered in place of peer review, independent scientific testing and statistical rates of error, informing us only that the *Daubert* factors do not constitute a "definitive checklist or test" and that the gatekeeping inquiry must be "tied to the facts" of a particular case. *Id.* at 150, 119 S.Ct. at 1175. The *Kumho* test shrinks to little more than the previous "general acceptance" test in some cases.

¶ 8 Given this history, we are inclined to view the current matter as one of general admissibility and reliability pursuant to Oklahoma common law and the legal parameters of "just compensation" pursuant to Article II, section 24 of the Oklahoma Constitution, rather than a *Daubert* question.

## II. THE APPRAISAL QUESTION

¶ 9 In our assessment of whether Appraiser's methodology was legally permissible to determine the just compensation that our Constitution requires for a taking, two of Appellants' arguments stand out. The first is that Appraiser used previously negotiated sales of easements to parties with the power and need to condemn as a baseline for valuation. Appellants argue that such methodology is either invalid pursuant to current law, or that it cannot properly reflect just compensation because it resulted in a per-acre value for the easement that was approximately four times greater than the apparent fee simple value of the same property. The second is that Appraiser's alleged use of a "gross income multiplier" method to arrive at a similar conclusion is equally flawed.

### A. Negotiated Sales of Property to Entities With the Power to Condemn the Property In Question

¶ 10 Appellants' prime complaint is that Appraiser used pre-condemnation purchases of similar easements by public utilities to arrive at an easement value approximately four times the agreed fee simple value of the land taken. The singular question before us is whether these purchases are admissible to reflect just compensation for the taking of similar property in a condemnation proceeding. We find they are not.

### Legal History

¶ 11 The Supreme Court addressed this issue in *Durell v. Pub. Serv. Co. of Oklahoma,* 1935 OK 1103, 174 Okla. 549, 51 P.2d 517, stating, in its second syllabus, "On trial of action to determine damage to land taken by eminent domain, evidence of condemnation prices paid for other tracts of land is incompetent." *Durell* went on to explain as follows:

in other Oklahoma cases, is inapplicable as a matter of law in this particular case. These are questions of Oklahoma law, not *Daubert* questions.

The rule in nearly every state in the Union, and the overwhelming weight of authority, is that where the question in issue is the market value of land, evidence of condemnation prices of other tracts of land is incompetent for the purpose of proving the market value of the tract in question. Fundamentally, this is because those other sales are regarded as being **little other than compromises**, and the Courts proceed on the theory that **in many instances the condemnor is willing to pay more than the market value, or the owner is willing to take less than the market value, in order to avoid the trouble, annoyance, and expense of a lawsuit**. Thus the rule is closely akin to the rule which forbids evidence of offers of compromise in the same suit.

*Id.,* ¶ 14 (emphasis added).

¶ 12 This highlighted paragraph of *Durell* is clear that the sale price of a public utility easement negotiated after the decision had been made to acquire the property, but *before condemnation proceedings were initiated,* i.e., made in *anticipation of* the "trouble, annoyance, and expense of a lawsuit," is not reliable evidence of property value in a condemnation proceeding. *Durell* further noted that such transactions are, in essence, compromise settlements of a potential lawsuit, and generally inadmissible under Oklahoma law.

¶ 13 The Supreme Court re-affirmed the rule of *Durell* in *Oklahoma Tpk. Auth. v. Deal,* 1965 OK 57, ¶ 17, 401 P.2d 508. *Deal* quotes 18 Am.Jur., Eminent Domain, Sec. 352, page 996, for the principle that "[t]he price paid for neighboring land when taken by eminent domain, either as a result of an award, a verdict, or a **settlement**, is inadmissible, as it is not a sale in open market [sic] and does not show market value." (Emphasis added). We find no Supreme Court case overturning *Deal,* or stating that it is no longer good law. Appellees argue, however, that a change in this rule may have been tacitly approved by the Supreme Court some 34 years later by the Court's refusal to grant certiorari in the case of *Western Farmers Elec. Co-op. v. Enis,* 1999 OK CIV APP 111, 993 P.2d 787.

¶ 14 The *Enis* opinion relied on a line of oil and gas pooling cases culminating in *Coogan v. Arkla Expl. Co.,* 1979 OK 6, 589 P.2d 1061, as having changed the rule of *Durell* and *Deal. Coogan* was a pooling case which held that sales of leases *prior to the institution of a pooling proceeding* were admissible evidence of lease values in a pooling case. *Enis* interpreted this holding as partially repudiating the holding of *Durell* and *Deal* in condemnation proceedings, and held that the previous sale price of an easement negotiated by a party with the power to condemn constituted admissible evidence of just compensation for a new easement in a condemnation proceeding.

¶ 15 Appellees argue that the Supreme Court's denial of certiorari in the *Enis* case tacitly overturned *Durell* and *Deal,* and made the rule of *Coogan* applicable in condemnation cases. We find no other indication that the Supreme Court has overruled *Durell* and *Deal,* however, and no other reported case applying the new rule implied by *Enis,* or extending *Coogan* beyond the pooling context. For the reasons below, we find that *Durell* and *Deal* are still good law.

### B. *Coogan* Indicated That Its Rule Did Not Apply In Condemnation Cases

¶ 16 Although *Enis* cited *Coogan* as changing a rule that had been otherwise established for over 60 years, *Coogan* appears to *distinguish* the rule in pooling cases from the established rule in condemnation cases, rather than merge the two. *Coogan* is clear that Oklahoma has traditionally applied different evidentiary rules for lease values in pooling cases versus property values in condemnation cases. *Coogan* stated:

[W]e are not persuaded by the condemnation cases cited as authority for establishing the inadmissibility of price paid for their leases as evidence of market value. We have heretofore allowed prior negotiated terms to stand as substantial evidence of value [in pooling cases].

*Id.,* ¶ 10 (citation omitted).

The appellants' position in this respect is that a forced pooling order is in effect a condemnation of a mineral lease, and as

such, the incompetency of condemnation price as evidence of value should also be applied to evidence of value of the nonparticipating owner's interest in this pooling order. The case under consideration here is easily distinguishable from the instance where condemnation price is inadmissible. *Id.*, ¶ 11.

¶ 17 *Coogan* appears to *expressly reject* the argument that a forced pooling order is a form of condemnation proceeding subject to the rule of *Durell* and *Deal*, and holds that the rule in pooling cases is different. In doing so, it distinguished the different valuation requirements of pooling law from those of condemnation law, rather than holding that pooling principles apply in condemnation cases. The procedural and factual situation is quite different in condemnation and pooling actions, and the valuation law developed in pooling actions is not applicable in condemnation actions. We find that *Coogan* recognized this difference, rather than merging the two rules.

¶ 18 We finally observe that we find no other published case applying this method to value an easement condemnation. *Enis* appears to be an outlier in 80 years of published case law. We respectfully disagree with the *Enis* interpretation that the Supreme Court in *Coogan* went beyond the context of pooling cases and intended to change the long-established rule of *Durell* and *Deal*. We further disagree with the *Enis* interpretation that sales made after a public utility has started the statutorily mandated pre-condemnation negotiations are open market transactions that may act as evidence of just valuation.

## C. Settlements Negotiated Prior to Condemnation Are Compromise Settlements, and Do Not Reflect the Actual Value of the Property Taken

¶ 19 The law of Oklahoma has long generally held that compromise settlements are inadmissible as subsequent evidence of either liability for, or the value of, a claim.

The Supreme Court applied this rule in *Durell* and *Deal*. *Enis* held, however, that this exclusionary rule applies only to transactions and compensation that are "the *result* of a legal proceeding." *Enis* may thereby have changed the rule of *Deal* that awards, verdicts, and *settlements* are inadmissible as valuation evidence, making at least some, if not all, settlements admissible.[3] Such a general change to this exclusionary rule, allowing settlements to be introduced as evidence of value would be a radical departure from existing precedent. We therefore interpret *Enis* as holding that easement settlements with parties with the power to condemn are not "compromises or settlements" under the law, rather than fashioning a new doctrine that compromise settlements are inherently admissible if they occur before suit is filed.

¶ 20 In general, " 'market value' means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling." *C&H Power Line Constr. Co. v. Enter. Products Operating, LLC*, 2016 OK 102, ¶ 6, 386 P.3d 1027. Similarly put, "Fair market value is the amount of money which a purchaser willing, but not obliged, to buy the property would pay to an owner willing, but not obliged, to sell it." *State ex rel. Dep't of Transp. v. Lamar Advertising of Okla.*, 2014 OK 47, ¶ 18, 335 P.3d 771. *Enis* proposed that the prior purchases of easements by parties with the power to condemn were arms-length market transactions by parties under no necessity to buy or sell, rather than settlements by parties contemplating a necessary condemnation and seeking to avoid the trouble, annoyance, and expense of a lawsuit. We disagree with that conclusion.

¶ 21 We first note that a public utility is clearly neither a classic "willing buyer under no necessity," nor is it operating in a free market, because it *cannot choose between a number of equivalent properties in the marketplace*. It must obtain an easement over one specific tract of land *only*, at whatever

---

3. By how much *Enis* may have changed this rule is open to debate, depending on exactly *when* a compromise settlement is considered to be the "result of a legal proceeding." It may allow evidence of settlements that occur before a final verdict, or it may allow only evidence of settlements that occur before suit is filed.

cost is legally necessary. In a normal market, if a seller seeks an above market price, the seller will lose the sale to more reasonably priced equivalent property. This primary market restraint is entirely missing in a condemnation situation because an otherwise equivalent property that would satisfy a normal buyer is not equivalent to a utility that must obtain a specific property in a specific location.[4]

¶ 22 In the case of roads or power lines, even a slight deviation in route is impossible without the utility substantially re-working its entire construction plan. By comparison, a buyer in the open market is not subject to substantial disruption or financial penalty if the buyer chooses one property as opposed to another. Above all, an open market buyer may decide *not to purchase at all* if the price is too high. A condemnor cannot do so. We fundamentally disagree that a potential condemnor in such a case is involved in an ordinary market transaction.

¶ 23 We also find it clear that the seller is not a classic "willing party" if he/she knows that property will eventually be taken at a certain price by court order, irrespective of whether the seller or buyer would agree to that price. *Enis* removed this fact from consideration by noting that "condemnation was never mentioned as a part of any of [the] conversations and negotiations." 1999 OK CIV APP 111 at ¶ 5, 993 P.2d 787. This principle, that a negotiated purchase by a condemnor becomes admissible if the landowner *does not know* that condemnation will result from a failure to settle, leads to an irrational result, i.e., *a landowner who is ignorant of condemnation law may use a different valuation method, and receive a higher award, than one who is not.*

¶ 24 The practical implication of such a rule is this: If evidence that an easement was

negotiated for more than the fee simple value of the property becomes admissible or inadmissible based on whether the landowner knew that the utility had the power to condemn, it is inevitable that any *future condemnor will be sure to mention the power to condemn during negotiations.* We see little logic in such a substantial difference in the admissibility of evidence or legally acceptable valuation techniques being dependent on whether a potential condemnor adds boilerplate language to an offer stating that it has the power to condemn.

¶ 25 Although its rationale may have been correct pursuant to the special facts of that case, we reject any argument that *Enis* made a generally negotiated sale to a utility with the power to condemn something other than a compromise settlement made in anticipation of litigation. We regard *Durell* and *Deal* as being correct on this question.

### D. Settlement Prices For Small Parcels May Be Inflated by Non-Market Costs

¶ 26 We further disagree that such settlements, even if not inherently inadmissible, represent competent evidence of normal market transactions that could establish fair compensation. Instead, we find the rule of *Durell* and *Deal* to be logical: a pre-condemnation settlement price can substantially deviate from the market value of the property taken because of factors *unrelated to the value of the property itself.*

¶ 27 As we noted in the previous section, the statutory condemnation procedure imposes certain fixed costs and unknown risks on the condemnor. Aside from the predictable fixed cost of initiating a successful routine condemnation, if a landowner rejects the commissioners' report, potential costs escalate rapidly.[5] Although these fixed and poten-

---

4. A fair comparison is the situation in which a person with substantial means is seized with a desire to buy his or her modest childhood home. That buyer may be willing to pay many times the market price because *only this property will suffice*. This price is, however, hardly competent evidence of fair market value of the property to a normal market buyer, or a valid comparison to the value of similar property.

5. Pursuant to 27 O.S.2011 § 11, a utility has to pay the landowner's legal fees if the jury reaches a verdict more than 10% above the commissioners' report, and the utility has *no power* over what the commissioners may decide. This case involves four acres of land but has generated 1,300 pages of record and an additional 700 pages of trial/hearing testimony, and is a good example of how such proceedings may present a financial risk to the parties in terms of costs and

tial costs have less influence if prorated over the acquisition of, for example, 100 acres, the smaller the parcel, the higher these fixed and variable costs become in relation to the value of the property. This is especially true where an individual easement covers only a few acres, as is the case in a typical power line or pipeline case.

¶ 28 A utility may therefore rationally agree to buy an easement for four times the open market value of each acre of land *if* the average litigation costs and fees will likely exceed three times the open-market price per acre. One acre of land which is worth $2,000 in the open market may be worth $8,000 per acre *to the condemnor* if the condemnation process and associated uncertainties could add an additional $6,000 to the final cost. This does not show; however, that $8,000 is an open-market price for one acre of land. As *Durell* properly observed, "in many instances the condemnor is willing to pay more than the market value, or the owner is willing to take less than the market value, in order to **avoid** the trouble, annoyance, and expense of a lawsuit" 1935 OK 1103 at ¶ 14, 174 Okla. 549, 51 P.2d 517 (emphasis added). This factoring of fixed and contingent litigation costs into any rational transaction not only underlines the fact that such transactions are compromise settlements, but also explains why such transactions do not represent a fair open-market valuation of the property taken.

### E. Value to the Condemnor

■ ¶ 29 It is further an established general principle of condemnation law that just compensation represents the loss to the landowner, not the special value of the property to the condemnor. A public utility is a rational economic actor, and, as we previously noted, may pay $8,000 for an acre of land that is worth $2,000 per acre in the open market *if* the purchase saves the condemnor $6,000 per acre in condemnation costs and risk. Howev-

er, the difference in price is rational only because the purchase has a special value to that utility—the value of avoiding the transaction costs and uncertainties of condemnation. In the example above, $6,000 per acre of the purchase price reflects special value to the condemnor, not the fair market value of the property taken from the owner.

### F. Conclusion to Section II

¶ 30 For the reasons stated above, we find that the purchase of an easement across property that *will* be taken by condemnation if mandatory negotiations are unsuccessful is not a transaction between a willing seller and willing buyer without compulsion, and *does not properly reflect the market value of the property taken.* As such, we find that these transactions are generally inadmissible as comparable sales to show the value of similar property in a condemnation proceeding.[6]

### III. GROSS RENT MULTIPLIER

■ ¶ 31 Appellants also argue that Appraiser used an inadmissible form of "gross rent multiplier" calculation to arrive at his easement valuation. Generally, a "gross rent multiplier" (sometimes referred to as a "gross income multiplier") method is used to assign an appraised value to rental property by taking the annual rental income before expenses and multiplying it by an accepted factor to arrive at a property value. The factor is often derived by looking at the local sale price of properties versus the rental income generated by comparable properties. *See St. Louis Cty. v. Meyer Properties, LLC*, 250 S.W.3d 833, 836 (Mo. Ct. App. 2008). This method recognizes that the adjusted value of the income stream an owner derives from rental property may evidence a more accurate property value than a sale of comparable property would show.

potential fees that dwarf the actual value of the land in question.

6.  A further unusual issue is raised by this case. Trial testimony indicated that the property had an "easement value" of $8,000 per acre, but an "agricultural value" of $2,000 per acre. The argument is essentially one that the land is now

worth more *because* a utility wishes to place a power line across it. We doubt that the *highest and best use* of a property can be "to host an easement" or that an increase in value caused by the *condemnor's intended use* of the property can be included when calculating just compensation.

¶ 32 Although this technique is sometimes applied in valuing rental property or businesses in divorce cases, we find no history of this technique being used to value easements across agricultural land in Oklahoma. Only one reported Oklahoma case deals with this method of valuation in a condemnation scenario, *State ex rel. Dep't of Transp. v. Lamar Advert. of Oklahoma, Inc.*, 2014 OK 47, 335 P.3d 771. The situation in *Lamar* is highly unusual and instructive. In *Lamar*, the State wished to take a small parcel of land for highway improvement. To do so, it acquired real estate that Lamar had leased to host a billboard. The Court first found that Lamar was entitled to the fair market value of the property interests taken, whether real or personal. *Id.*, ¶ 15.

¶ 33 The State argued that the fair market value of the billboard was the depreciated value of the structure itself as personal property, and the value of the property taken was only $60,000, based on the value of Lamar's lease and the value of the billboard structure. Lamar argued that the billboard generated substantial income above this amount, and that "just compensation" required the State to compensate Lamar for the lost income stream caused by the taking. Lamar's expert used a gross income multiplier method, a method that he testified is commonly utilized by buyers and sellers of billboard advertising, to determine that Lamar's fair market value loss was $410,000. The Court found that the amount a purchaser would pay for the billboard in a market transaction was properly based on the income stream that the billboard could generate in that location, rather than the simple value of the billboard structure and lease alone. *Id.*, ¶ 22.

¶ 34 Although *Lamar* allowed the use of a gross rent multiplier method in a case involving the condemnation of property, *the facts presented there are highly unusual.* The billboard had a market value much greater than the value of the structure and the underlying lease. This was because the billboard generated a large stream of income that could not

be replaced by simply moving the billboard to a new location, because no such location was legally available.[7] "Just compensation" therefore required that the State pay for the total destruction of this profitable enterprise, and the Court found that a gross rent multiplier was an applicable method to calculate compensation under those circumstances. That decision clearly follows the constitutional requirement of just compensation. We find, however, no applicability for this method in the current case.

## IV. IS IT POSSIBLE FOR JUST COMPENSATION TO EXCEED THE FEE SIMPLE VALUE OF THE PROPERTY TAKEN?

¶ 35 We have determined that sales of easements to public utilities with the need and power to condemn may not be used as valuation evidence in this case. Appellants and *Amici* request that we go further, and hold that constitutional just compensation for an easement across property *cannot* exceed the amount required to purchase the same property in fee simple. Any such ruling at this juncture would be an advisory opinion delving into a constitutional issue, and we decline to enter into that area.

### CONCLUSION

¶ 36 For the reasons stated above, this matter is reversed and remanded for further proceedings.

¶ 37 **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

BARNES, P.J., and WISEMAN, J., concur.

---

7. The *Lamar* opinion indicates at 10 and 23 that the billboard was allowed in its present location under the provisions of the Highway Advertising Control Act, 69 O.S. §§ 1271, *et. seq.*, but regulations on new billboards would prohibit Lamar from simply relocating it to a similar site.